# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| IN RE: Family Dollar Stores, Inc., | ) | |
| Pest Infestation Litigation | ) | 2:22-md-03032-SHL-tmp |
| | ) | (MDL Docket No. 3032) |
| This Document Relates To: | ) | |
| | ) | Jury Trial Demanded |
| ALL CASES | ) | |
| | ) | |

## AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Dondrea Brown, Muriel Vanessa Brown, Vinnie L. Smith, Julian A. Graves, Reginald and Sonya Fields, Taylor Lorimer, Martha "Keisha" Lacy, Sheena Bibbs, Jerome Whitney, Tina Bishop, Sonya Mull, and Christine Robinson (collectively referred to as, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, bring this Amended Consolidated Class Action Complaint against Defendants Family Dollar Stores of Tennessee, LLC; Family Dollar Stores of Arkansas, LLC; Family Dollar Stores of Alabama, LLC; Family Dollar Stores of Louisiana, LLC; Family Dollar Stores of Mississippi, LLC; Family Dollar Stores of Missouri, LLC; Family Dollar Services, LLC; Family Dollar, Inc.; Family Dollar Stores, Inc.; Dollar Tree, Inc.; and Dollar Tree Stores, Inc. (collectively referred to as "Family Dollar" or "Defendants"), for their deceptive, negligent, reckless, and/or intentional practice of selling contaminated products by virtue of a rodent infestation, general lack of pest control, and other unsanitary conditions in stores throughout Mississippi, Arkansas, Louisiana, Alabama, Missouri, and Tennessee (together, the "Affected States").

Plaintiffs seek both injunctive and monetary relief on behalf of the proposed Classes (as defined herein), including, but not limited to, requiring full and accurate disclosure of the rodent infestation, presence of pests, and other unsanitary conditions and restoring monies to the members of the proposed Classes. Plaintiffs allege the following based upon personal knowledge, investigation by counsel, and facts that are a matter of public record and, as to all other matters, upon information and belief.

## I.   NATURE OF ACTION

1.      Family Dollar is a value store chain that aspires to be "[t]he best small-format value

and convenience retailer, serving the needs of [its] shoppers in the neighborhoods [it] serves."[1]

2.      Family Dollar sells groceries and household goods at discounted prices in stores throughout the United States including over-the-counter medications, medical devices, dietary supplements, cosmetics, human food, and pet food (the "Products").

3.      On or about February 18, 2022, Family Dollar temporarily closed 404 of its stores in Tennessee, Mississippi, Arkansas, Louisiana, Alabama, and Missouri ("the Affected Stores") after the U.S. Food and Drug Administration ("FDA"), announced on February 11, 2022 in a 22-page report ("Inspection Report," attached hereto as Exhibit A) that it had found unsanitary and dysfunctional conditions, including an appalling and pervasive rodent infestation that compromised the Products stored inside Family Dollar's Distribution Center 202 (the "Distribution Center") which is located in West Memphis, Arkansas (the "Rodent Infestation").[2][3] The Inspection Report was the product of approximately 15 inspections at the Distribution Center conducted between January 11, 2022 and February 11, 2022.

4.      The sprawling Rodent Infestation was never fully disclosed to unsuspecting Family Dollar customers, even though Family Dollar knew about it in detail, until Family Dollar finally sought to frantically triage the dangerous news which made national headlines and alerted and warned unsuspecting customers about the dangers, harms, and nature of the concealment.[4]

---

[1] *About Family Dollar*, https://www.familydollar.com/about-us (last visited Aug. 2, 2022).
[2] *Family Dollar Stores Issues Voluntary Recall of Certain FDA-Regulated Products in Six States Including Drugs, Devices, Cosmetics, Foods*, BUSINESS WIRE (Feb. 18, 2022) https://www.businesswire.com/news/home/20220218005563/en/Family-Dollar-Stores-Issues-Voluntary-Recall-of-Certain-FDA-Regulated-Products-in-Six-States-Including-Drugs-Devices-Cosmetics-Foods.
[3] A complete listing of the Affected Stores is attached as Exhibit B.
[4] *See* Aya Elamroussi, *Family Dollar issues recall for various products after FDA inspection reveals rodent infestation at Arkansas facility*, CNN, (Feb. 20, 2022) https://www.cnn.com/2022/02/19/us/family-dollar-recall-rodent/index.html; Vimal Patel, *Rodent*

5.     While Family Dollar has admitted, "the conditions at the West Memphis Distribution Center were unacceptable," (*see* Defs.' Mem. of Law in Support of Mot. to Dismiss, Dkt. No. 77-1 at 29 of 31), in reality, it was so out-of-control and dysfunctional that in 2021 employees were feeding the resident rats potato chips as depicted here:[5]



6.     As the FDA Report makes clear, Family Dollar has been aware of the Distribution Center's rodent problems since at least January 2020. Inspection Report at 13 ("Your firm was aware of an increased presence of rodents in the Distribution Center (DC) **since at least January 2020**.") (emphasis added). Despite having knowledge of the increased presence of rodents for at least two years prior to the issuance of the FDA report, Family Dollar concealed this information from consumers until *after* the FDA issued its report on February 11, 2022. In other words,

---

*Infestation at Family Dollar Warehouse Leads to Hundreds of Closures*, NEW YORK TIMES (Feb. 22, 2022), https://www.nytimes.com/2022/02/19/us/fda-family-dollar-recall.html.

[5] Melissa Moon, *Another complaint about rats at Family Dollar Facilities*, WREG Memphis (Jan. 4, 2022), https://wreg.com/nes/local/another-complaint-about-rats-at-family-dollar-facilities/; Brendan Case, *Rat-Plagued Warehouse Winds Down as Family Dollar Faces Lawsuits*, INSURANCE JOURNAL (July 20, 2022), https://www.insurancejournal.com/news/national/2022/07/20/676686.htm ("Around the end of the year, an employee named Robert Bradford recorded himself offering a potato chip to a brownish grey rat sitting on a cardboard box.").

consumers were unknowingly purchasing Contaminated Products for years before Family Dollar issued its voluntary recall after the FDA report came out.

7.     Family Dollar cannot refute that ubiquitous rodent decay, excreta, and odors at the Distribution Center compromised the Products and that the Rodent Infestation was prevalent "throughout the entirety" of the Center and where human food was stored. Inspection Report at 1; *see also* Inspection Report at 2, 4, 5, 10 and 15 (noting that that "northwest," "northeast," "southwest," "southeast," and "center" of the Distribution Center were all infested).

8.     As early as November 2019, Family Dollar's then pest control company, Rentokil, reported that it had "[c]hecked all the interior MRT's and found at least 100 mice."[6] Rentokil Proof of Service, Nov. 7, 2019 at MDL.RNAINC00000198 (attached hereto as Exhibit B). Family Dollar was monitoring rodent activity at the Distribution Center and requested "a list of all catchings at the end of each week . . . with [the] purpose of customers being able to forward list to their managers." Rentokil Proof of Service, Nov. 21, 2019 at MDL.RNAINC00000169 (attached hereto as Exhibit C). During this visit Rentokil also "identified gaps under doors. This provides an entry point for rodents and other pests." *Id.* at MDL.RNAINC00000168.

9.     Throughout 2021, Rentokil identified several areas that needed to be addressed by Family Dollar in order to address their rodent problems. This included, but was not limited to, gaps that allowed pest access, accumulation of food products and non-food that attracted pests, debris accumulation in and around dumpsters and compactors that attracted pests, and cracks or damage

---

[6] "MRT" stands for "Multi Rodent Trap Connect," which "is a sensor that alerts Rentokil of any live mouse captures. This device is attached to a mechanical rodent control device or metal trap, such as JT Eaton Little Pete or Repeater, or Victor TinCat, allowing for the containment of multiple mice."                    Rentokil,                    PestConnect                    FAQs, https://www.rentokil.com/us/assets/content/files/pestconnect-faq-mar20.pdf

to exterior walls allowing pest access. *See* Rentokil Proof of Service, Mar. 17, 2021 at MDL.RNAINC00001499-501 (attached hereto as Exhibit D).

10.      The issues identified by Rentokil in March 2021 persisted in May 2021 without remediation, with Rentokil spending its entire visit just on aisle 1. *See* Rentokil Proof of Service, July 2, 2021 at MDL.RNAINC00001966 (attached hereto as Exhibit E).

11.      On November 29, 2021, Ecolab, a pest control company hired by Family Dollar, prepared a report for Family Dollar titled "28 Issues Identified" at the Distribution Center.[7] "Ecolab Report," (attached hereto as Exhibit F).

12.      The Ecolab Report, much like the FDA Report issued three months later in February 2022, explained that the entire Distribution Center was infested "with resident roof rats, they have full run of the facility thru beams and unused conveyor system" and it recommended a "complete fumigation" along with "liquid and solid bait use." Exhibit F at ECOLAB_000136.

13.      Ecolab also produced dozens of 2022 Customer Service Reports ("Ecolab Customer Service Reports"). For instance, in a Customer Service Report dated April 5, 2022, discussing the expansive nature of the problem in every aisle in the Distribution Center, Ecolab stated:

Recommend starting at aisle 1 and work thru all aisles, pull all pallets from top row and work your way down row by row to remove ALL old rodent droppings.

Ecolab Customer Service Report at ECOLAB_000061 (attached hereto as Exhibit G).

14.      In a Customer Service Report dated January 5, 2022, discussing dock door gaps,

---

[7] Plaintiffs obtained the "confidential" report and other relevant materials from Ecolab concerning its pest control work at the Distribution Center via subpoena. Plaintiffs have served additional subpoenas on Family Dollar's other pest control companies and are optimistic that they will receive additional probative information and materials concerning the Rodent Infestation, the dysfunctional nature of the Distribution Center, and what Family DOllar knew and when.

Ecolab warned Family Dollar:

-the following overhead door(s) do not seal properly to keep pests out. 95%of overhead doors do not seal, seals recently installed do not seal properly.

Ecolab Customer Service Report at ECOLAB_000011 (attached hereto as Exhibit H).

15.     On September 9, 2022, pursuant to an entered inspection protocol, *see* Dkt. Nos. 55-1, 57, the Parties inspected the Distribution Center for approximately five hours ("September 2022 Inspection").

16.     Here is a photograph taken during the September 2022 Inspection of manilla file folders located inside the Distribution Center:



17.     Here is a photograph taken during the September 2022 Inspection of Crayola crayons located inside the Distribution Center:



18.    Here is a photograph taken during the September 2022 Inspection of shrimp flavored soup packages located inside the Distribution Center:



19.     Here is a photograph taken during the September 2022 Inspection of Alpo Prime Cuts located inside the Distribution Center:



20.     As the FDA Report noted, Family Dollar "failed to implement appropriate and timely corrective action to ensure that product **that may be injurious to health due to potential contamination by rodent urine and excreta** and/or had been chewed or gnawed by rodents, or may have been subjected to filth conditions such as dirt and debris, was not distributed to your stores." Inspection Report at 12 (emphasis added).

21.     There are numerous serious health and safety dangers or risks associated with rodents including the potential presence of Salmonella, an organism which can cause serious and possible fatal infections in infants, young children, frail or elderly people, pregnant persons, persons with pre-existent pathology (*e.g.*, patients with cancer undergoing chemotherapy treatments, organ transplant recipient, etc.), others with weakened immune systems. Healthy

persons can also suffer severe reactions if infected with Salmonella. A person may become easily infected with Salmonella by eating foods contaminated with animal feces.

22.     Salmonella is not the only disease transmitted by rodents. Other dangers associated with rodents are Hantavirus Pulmonary Syndrome ("HPS"), Leptospiroris, Lymphocytic Chorio-meningitis ("LCM"), and Rat-Bite Fever are all spread through contact with rodent urine or feces. All of these diseases are harmful to human health.

23.     The Inspection Report describes that the Distribution Center was saturated with rodent urine, droppings and nesting materials – all of which led to the above-described diseases and other health risks that would be and are material to reasonable persons.

24.     In addition to being aware of the unsanitary conditions related to its lack of pest control and failure to store the products as recommended by regulators and manufacturers, it was also aware, or should have been aware, that it did not comply with Hazard Analysis Critical Control Point (commonly referred to as "HACCP"), a quality control and quality assurance standard.

25.     Defendants were aware of the Rodent Infestation as early as January 2020 but chose not to disclose it to its customers until after the voluntary recall of certain, but not all, products for sale.

26.     In a February 18, 2022 FDA Safety Alert, and based on the Inspection Report findings, the FDA declared that the Distribution Center demonstrated "a history of infestation." Press Release, FDA, FDA Alerts the Public to Potentially Contaminated Products from Family Dollar Stores in Six States (Feb. 18, 2022), https://www.fda.gov/news-events/press-announcements/fda-alerts-public-potentially-contaminated-products-family-dollar-stores-six-states ("FDA Safety Alert," attached hereto as Exhibit I).

27.     As noted in the Inspection Report, Family Dollar's own pest control records documented the capture of between 16 and 107 mice for all months of 2020 and from January through June of 2021. Inspection Report at 7. From July 2021 to December 2021, Defendants' pest control records revealed the presence of between 1 and 31 roof rats inside the Distribution Center, including where human food was stored. *Id.*

28.     Between March 29, 2021 and September 17, 2021, the FDA learned and reported in its Inspection Report that over 2300 rodents were captured at the Distribution Center. *Id.* Worse, during a five-day span in just January 2022, 150 roof rats were captured, and following a subsequent fumigation that same month, approximately 1100 rodent carcasses were removed from the Distribution Center. *Id.*

29.     According to Family Dollar, on November 11, 2021, its pest control company at the time, Rentokil, reported that the facility had "more of a population" of rats "than expected." Defs.' Responses and Objections to Pltfs.' First Set of Interrogatories," Response to Interrogatory No. 6 at 16-17 (attached hereto as Exhibit J).

30.     In January 2022, Ecolab pest control company, who Family Dollar switched to after Rentokil in November 2021, fumigated the Distribution Center. *Id*.

31.     According to the FDA Safety Alert:

"Families rely on stores like Family Dollar for products such as food and medicine. They deserve products that are safe," said Associate Commissioner for Regulatory Affairs Judith McMeekin, Pharm.D. "No one should be subjected to products stored in the kind of unacceptable conditions that we found in this Family Dollar distribution facility. These conditions appear to be violations of federal law that could put families' health at risk. We will continue to work to protect consumers."

…

Conditions observed during the inspection included live rodents, dead rodents in various states of decay, rodent feces and urine, evidence of gnawing, nesting and rodent odors throughout the facility, dead birds and bird droppings, and products

stored in conditions that did not protect against contamination.

FDA Safety Alert at 1-2.

32.     In addition to the FDA's findings, the Rodent Infestation at the Distribution Center has also been investigated by the Arkansas Department of Health and is currently the subject of lawsuit brought by the Arkansas Attorney General pending in Arkansas state court and a Federal grand jury investigation brought in the United States District Court for the Eastern District of Arkansas.

33.     Family Dollar knew or should have known of the Rodent Infestation. It had a duty and obligation to inspect its facilities, including distribution centers, for safety and health-related issues and to ensure that pest control measures were being taken, were effective, and were being undertaken by qualified exterminators as recommended. Nevertheless, Family Dollar chose to ignore said duties and obligations and further chose to omit information about the Rodent Infestation and otherwise conceal the Rodent Infestation from Plaintiffs and the Classes. It did this so that it could continue to profit from the sale of the Products.

34.     In a Press Release, Arkansas Attorney General Rutledge stated "Family Dollar has had knowledge of this dangerous and massive rodent infestation for over two years, yet they continued to sell and profit from potentially contaminated goods. Consumers lost money and could have lost their lives."[8]

35.     Statements by Family Dollar employees confirm the concealing. According to Mr. Kevin Goins, operation's manager at the Distribution Center in 2021, "throughout 2021,

---

[8] News Release, Attorney General Leslie Rutledge, *Attorney General Rutledge Files Suit Against Family Dollar Following Rodent Infestation – Arkansas Attorney General* (April 28, 2022), https://arkansasag.gov/news_releases/attorney-general-rutledge-files-suit-against-family-dollar-following-rodent-infestation.

warehouse bosses told Family Dollar executives about the infestation on a weekly basis and recommended fumigating the facility" and "[t]heir reply was that shutting the distribution center down for a few days would be too expensive."[9]

36.     On January 19, 2022, in a letter responding to the FDA's "concerns regarding the product distributed" from the Distribution Center, Family Dollar, even though it knew about the Rodent Infestation and associated health risks, cavalierly stated "We believe that a recall of products shipped from the DC is not warranted at this time." Letter from Brad Hammock, Director Environmental, Safety and Health, Family Dollar, to Chad Whitwell, Compliance Officer, FDA (Jan. 19, 2022) at FD_MDL_00000279 (attached here to as Exhibit K).

37.     It was only on February 18, 2022, the same day that the FDA Safety Alert was issued and Family Dollar's conduct was exposed, that it finally announced it would initiate a limited voluntary retail level product recall of *only* FDA-regulated products that were affected by the Rodent Infestation. Remarkably, Family Dollar did not recall non-FDA regulated consumer products, such as toys, clothing, and household products, despite the fact that these products were also subject to contamination and posed the risk of disease from the Rodent Infestation. Collectively, the contaminated FDA-regulated products and the non-FDA regulated products are referred to herein as the "Contaminated Products."

38.     Despite its knowledge,[10] Family Dollar omitted information regarding the Rodent

---

[9] Brendan Case, *Rat-Plagued Warehouse Winds Down as Family Dollar Faces Lawsuits*, Bloomberg, (Jul. 20, 2022), https://www.bloomberg.com/news/articles/2022-07-20/rat-infested-family-dollar-dltr-warehouse-leads-to-recalls-and-lawsuits ("All they cared about was getting the products out, which meant more money for them.").

[10] On February 4, 2022, after being exposed by the FDA, Family Dollar "disposed of approximately 150 tons of product with potential damage." Letter from Brad Hammock, Director Environmental, Safety and Health, Family Dollar, to Chad Whitwell, Compliance Officer, FDA (Feb. 4, 2022) at FD_MDL_00000331 (attached hereto as Exhibit L).

Infestation and lack of pest control leading to unsanitary conditions from all advertising, promotion, or other contacts with Plaintiffs and members of the Classes prior to their purchase of the Contaminated Products and continued to ship the Contaminated Products to their stores from the Distribution Center. Because Family Dollar knowingly failed to disclose the Rodent Infestation, pest control issues, improper storage practices, and associated risk of contamination to consumers and failed to correct the problem, Plaintiffs and the Classes purchased the Contaminated Products of a lesser standard, grade and quality represented that do not meet ordinary and reasonable consumer expectations regarding the quality or value of the Contaminated Products and are unfit for their intended purpose. Plaintiffs and the Classes were similarly not able to take advantage, and /or made aware, of Family Dollar's 30-day Return Policy[11] (attached hereto as Exhibit M) on account of Family Dollar's concealment. Moreover, the contamination associated with the Rodent Infestation poses a health risk to consumers that used or handled the Contaminated Products.

39.     Plaintiffs bring this action on behalf of themselves and all those similarly situated (the "Classes" or "Class Members,") for Family Dollar's deceptive trade practices in violation of the consumer protection laws of Tennessee, Alabama, Arkansas, Louisiana, Mississippi, and Missouri as well as each state's common law. Plaintiffs seek damages, attorney fees and costs, punitive damages, and the replacement of, or refund of money paid to purchase the Contaminated Products, and any other legal relief available for their claims. Should Plaintiffs' demanded legal relief be unavailable or prove insufficient, Plaintiffs seek appropriate equitable and injunctive relief in the alternative pursuant to Fed. R. Civ. P. 8(a)(3).

---

[11]     Family     Dollar     Return     Policy,     Customer     Satisfaction     Agreement, https://www.familydollar.com/return-policy (last visited Oct. 17, 2022).

## II.    **PARTIES**

40.    Plaintiff Dondrea Brown is, and at all times relevant hereto has been, a citizen of Sweetwater, Alabama. During the relevant time period, Plaintiff Brown purchased various Contaminated Products, including but not limited to, diapers and other baby products, cosmetics, human foods, and household goods such as laundry detergent and fabric softener from the following Family Dollar stores: #868, 303 South Main Street, Linden, Alabama 36748-1725 and #12505, 206 Greensboro Street, Eutaw, Alabama 35462.

41.    Plaintiff Muriel Vanessa Brown is, and at all times relevant hereto has been, a citizen of Sweetwater, Alabama. During the relevant time period, Plaintiff Brown purchased various Contaminated Products, including but not limited to, body wash, cosmetics, toilet tissue, paper towels, and household goods such as laundry detergent and fabric softener from Family Dollar store #868, 303 South Main Street, Linden, Alabama 36748-1725.

42.    Plaintiff Vinnie L. Smith is, and at all times relevant hereto has been, a citizen of Earle, Arkansas. During the relevant time period, Plaintiff Smith purchased various Contaminated Products, including but not limited to, human food, pet food, cosmetics, dental products, over the counter medications, feminine products, products used for personal care, and household cleaning supplies from the following Family Dollar stores: #2994, 17668 U.S. Highway 64, Earle, Arkansas, 72331; #4112, 228 W. Broadway Street, Forrest City, Arkansas 72335; #2295, 138 Block Street, Marion, Arkansas 72364-1956; #785, 2113 East Broadway Street, West Memphis, Arkansas 72301-3454; #3180, 209 Shopping Way Boulevard, Ste. B, West Memphis, Arkansas 72301-1733; #11802, 420 South Avalon Street, West Memphis, Arkansas 72301; #798, 1800 Falls Boulevard, Wynne, Arkansas 723296.

43.    Plaintiff Julian A. Graves is, and at all times relevant hereto has been, a citizen of

15

Russellville, Arkansas. During the relevant time period, Plaintiff Graves purchased various Contaminated Products, including but not limited to, human food and household products such as trash bags from Family Dollar store #4009, 1200 South Knoxville Avenue, Russellville, Arkansas 72802-6401.

44.     Plaintiffs Reginald and Sonya Fields are, and at all times relevant hereto have been, citizens of Monroe, Louisiana. During the relevant time period, the Fields Plaintiffs purchased various Contaminated Products, including but not limited to, pet food and other household goods such as laundry detergent from Family Dollar store #834, 1421 Winnsboro Road, Monroe, Louisiana 71202-4523.

45.     Plaintiff Taylor Lorimer is, and at all times relevant hereto has been, a citizen of West Plains, Missouri. During the relevant time period, Plaintiff Lorimer purchased various Contaminated Products, including but not limited to, household goods including toilet paper, toothbrushes, and washing detergent, over the counter medications, human food, cosmetics, and pet food from Family Dollar store #1194, 1308 Porter Wagoner Boulevard, West Plains, Missouri 65775.

46.     Plaintiff Martha "Keisha" Lacy is, and at all times relevant hereto has been, a citizen of Durant, Mississippi. During the relevant time period, Plaintiff Lacy purchased various Contaminated Products, including but not limited to human food from Family Dollar store #1152, 369 East Madison Street, Durant, Mississippi 39063-3713.

47.     Plaintiff Sheena Bibbs is, and at all times relevant hereto has been, a citizen of Byram, Mississippi. During the relevant time period, Plaintiff Bibbs purchased various Contaminated Products, including but not limited to, dietary products, human food, baby medicine, soap, and hair products from the following Family Dollar stores: #5535, 2019A Raymond Road,

Jackson, Mississippi 39204-4131; and #6938, 3707 South Siwell Road, Jackson, Mississippi 39212-2405.

48.     Plaintiff Jerome Whitney is, and at all times relevant hereto has been, a citizen of Memphis, Tennessee. During the relevant time period, Plaintiff Whitney purchased various Contaminated Products, including but not limited to, human food, pet food, over the counter medications, household cleaning products, toiletries, and other items from the following Family Dollar stores: #8027, 287 N. Cleveland Street, Memphis, Tennessee 38104-7145; and #820, 142 North Avalon Street, Memphis, Tennessee 38104-2408.

49.     Plaintiff Tina Bishop is, and at all times relevant hereto has been, a citizen of Memphis, Tennessee. During the relevant time period, Plaintiff Bishop purchased various Contaminated Products, including but not limited to human food and other items from Family Dollar store #876, 2920 Lamar Avenue, Memphis, Tennessee 38114.

50.     Plaintiff Sonya Mull is, and at all times relevant hereto has been, a citizen of Memphis, Tennessee. During the relevant time period, Plaintiff Mull purchased various Contaminated Products from Family Dollar Stores located in Memphis.

51.     Plaintiff Christine Robinson is, and at all times relevant hereto has been, a citizen of Memphis, Tennessee. During the relevant time period, Plaintiff Robinson purchased various Contaminated Products, including but not limited to, medical devices, cosmetics and dietary supplements from Family Dollar store #10798, 308 East Main Street, Adamsville, Tennessee 38310-2318.

52.     Plaintiffs would never have purchased and used the Contaminated Products had they known the conditions in which they were stored and handled at the Distribution Facility.  The mere fact of the contamination, even setting aside consideration of the health risks posed by the

Contaminated Products, rendered the Contaminated Products wholly unacceptable to plaintiffs and unfit for sale or use.

53.     During the time Plaintiffs purchased and used the Contaminated Products, and due to the false and misleading claims and omissions by Defendants, Plaintiffs believed the Contaminated Products they purchased were safe and could be used as intended.  Plaintiffs were unaware the Contaminated Products contained, or had a risk of containing, Salmonella or other infectious diseases. Plaintiffs would not have purchased the Contaminated Products if the Rodent Infestation and the related potential for contamination with Salmonella or other infectious disease had been fully and accurately disclosed. Defendants had a duty to disclose these facts, particularly considering the ongoing health and safety risk posed to consumers.

54.     As a result of Defendants' conduct and omissions, Plaintiffs and putative class members were uniformly injured. Given the contamination, Plaintiffs, class members, and reasonable consumers would find the products to be worthless even if cleaning were possible. Additionally, Plaintiffs, class members, and reasonable consumers would not have purchased the Contaminated Products if they knew what Defendants knew, that is that the Contaminated Products were stored and housed in a dangerous, dysfunctional, and contaminated Distribution Center, which put consumers at risk in terms of their health and safety, as described herein and by the CDC and other health authorities on commonly transferred rodent diseases and illnesses. At the least, Plaintiffs, class members, and reasonable consumers would have paid less for the Contaminated Products for the time and effort to clean the products or would have purchased the products elsewhere.

55.     Moreover, any suggestion that Family Dollar properly offered customers a proper vehicle to return contaminated products as part of its 2022 recall or otherwise is erroneous. Family

19

Dollar's recall, which was only issued *after* its Rodent Infestation and conduct was exposed by the FDA, is defective because:

  a.   Family Dollar requires customers to return the Products to receive a refund, even though the FDA Safety Alert, which Family Dollar knew about or should have known about, advised customers to immediately throw away the Products.

  b.   Family Dollar requires customers to return the Products to the "store where they were purchased," yet the Affected Stores were closed.

  c.   Family Dollar does not include "products shipped directly to the store by the distributor or manufacturer" in the recall but does not specify which products are included in this category.

  d.   Many customers consumed the Products before receiving notice that the Products should be returned.

  e.   Customers may have purchased Products which were not subject to the recall in the first place.

  f.   Many customers may not even be aware of the recall due to the inadequacy of the notice.

56.     Defendant Family Dollar Stores of Tennessee, LLC is incorporated in Virginia and has its principal place of business at 500 Volvo Pkwy in Chesapeake, Virginia, 23320.

57.     Defendant Family Dollar Stores of Arkansas, LLC is incorporated in Virginia and has its principal place of business at 500 Volvo Pkwy in Chesapeake, Virginia. 23320.

58.     Defendant Family Dollar Stores of Alabama, LLC is incorporated in Virginia and has its principal place of business at 500 Volvo Pkwy in Chesapeake, Virginia. 23320.

59.     Defendant Family Dollar Stores of Louisiana, LLC is incorporated in Virginia and has its principal place of business at 500 Volvo Pkwy in Chesapeake, Virginia. 23320.

60.     Defendant Family Dollar Stores of Mississippi, LLC is incorporated in Virginia and has its principal place of business at 500 Volvo Pkwy in Chesapeake, Virginia. 23320.

61.     Defendant Family Dollar Stores of Missouri, LLC is incorporated in Virginia and

has its principal place of business at 500 Volvo Pkwy in Chesapeake, Virginia. 23320.

62.     Defendant Family Dollar Services, LLC is incorporated in North Carolina and has its principal place of business at 500 Volvo Pkwy in Chesapeake, Virginia, 23320.

63.     Defendant Family Dollar, Inc. is incorporated in North Carolina and has its principal place of business at 500 Volvo Pkwy in Chesapeake, Virginia, 23320.

64.     Defendant Family Dollar Stores, Inc. is incorporated in Delaware and has its principal place of business located at 500 Volve Pkwy, Chesapeake, Virginia. Defendant Family Dollar is a brand under its parent company, Defendant Dollar Tree, Inc. Defendants Family Dollar Stores, Inc. and Defendants Dollar Tree, Inc. and Dollar Tree Stores, Inc. share principals, including but not limited to, Chief Executive Officer, Chief Strategy Officer, Chief Information Officer, Chief Merchandising Officer, Chief Operating Officer, Chief Legal Officer, and Senior Vice President.

65.     Defendant Dollar Tree, Inc. is incorporated in Virginia corporation with its principal place of business located at 500 Volve Pkwy, Chesapeake, Virginia.  According to its Securities and Exchange Commission filings, the Chief Merchandising Officer of Dollar Tree Inc. leads the merchandising, marketing and global sourcing functions for both Dollar Tree and Family Dollar business segments, and the Enterprise President of Dollar Tree, Inc. leads merchandising, store operations, and supply chain functions for the Dollar Tree and Family Dollar business segments.[12]

66.     Defendant Dollar Tree Stores, Inc. incorporated in Virginia corporation with its principal place of business located at 500 Volve Pkwy, Chesapeake, Virginia. Defendant Dollar

---

[12] *See* https://www.sec.gov/Archives/edgar/data/935703/000093570319000057/ex991enterprise-levell.htm.

Tree Stores, Inc. and Dollar Tree, Inc. share the same principals.

67.     Defendants are responsible for the manufacturing, marketing, distribution, sale, and labeling of the Contaminated Products to millions of consumers throughout the States.  Defendants created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the Contaminated Products.

## III.     JURISDICTION AND VENUE

68.     This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d) for the following reasons: (a) some of the class members are citizens of a state that is different from the citizenship of the Defendants; (b) the putative class size is greater than 100 persons; (c) the amount in controversy in the aggregate for the putative class exceeds the sum of $5 million, exclusive of interest and costs; and (d) the primary Defendants do not include States, State officials, and/or other governmental entities against whom the district court may be foreclosed from ordering relief.

69.     This Court has specific personal jurisdiction over Defendants because the advertising, marketing, and sale of the Contaminated Products, which included or risked including dangerous substances, occurred in parts of Tennessee that are located in this District.

70.     Venue is proper in Tennessee under 28 U.S.C. §1391(b)(1) & (2) and 28 USC §1391(d) because Defendants regularly conduct substantial business within this District.

71.     Venue is also proper in Tennessee under 28 U.S.C. §1391(b)(2) because a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in this District, namely Defendants' advertisement, sale, and marketing of the Contaminated Products, which occurred in this District and caused financial harm to members of the putative class that reside in this District.

## IV.   **FACTUAL BACKGROUND**

72.    In 2015, Defendant Dollar Tree acquired Defendant Family Dollar for $9.2 billion. The two companies merged, but as a result of the large acquisition costs, the companies engaged in cost-cutting programs. As a result, essential services like pest and rodent control were not adequately funded.

73.    In addition, third-party contractors were used to deliver goods to the Distribution Centers and were incentivized to drop off and leave with no compensation for cleaning up any spills, breakage, or other damages.

74.    Outrageously, in November 2021, and while it knew about the pervasive Rodent Infestation taking place at its Distribution Center, Defendant Dollar Tree announced "a plan to raise the prices of most items in all its stores to $1.25 from $1."[13]

75.    Family Dollar's Distribution Center opened in 1994 and is approximately 850,000 square feet, and the Distribution Center services stores in Arkansas, Louisiana, Texas, Oklahoma, Missouri, Illinois, Kentucky, Tennessee, George, Alabama, and Mississippi.[14]

76.    The Distribution Center is located next to a large pond. Here is a drone photograph of the outside of the Distribution Center taken during the Parties' September 2022 Inspection:

---

[13] Coral Murphy Marcos, *Dollar Tree will raise prices to $1.25 by the end of April* (Nov. 23, 2021), New York Times, https://www.nytimes.com/2021/11/23/business/dollar-tree-price-increase.html (last visited Aug. 11, 2022).

[14] Family Dollar Distribution Center in West Memphis, AR, Family Dollar, https://www.familydollar.com/locations/ar/west-memphis/dc202/ (last visited Aug. 2, 2022).



77.    Here is a photograph taken during the September 2022 Inspection of dock doors located outside the Distribution Facility:



78.     Here is a photograph taken during the September 2022 Inspection of the inside of

the Distribution Facility:



79.     According to the Inspection Report, (and as reported by CBS News), findings by FDA inspectors at the Distribution Center included (but were not limited to):

a.     Both live rodents and "dead rodents of various states of decay" through the facility, including where food was stored.

b.     "A mouse carcass on a pallet" containing Hungry Jack Cheesy Scalloped Potatoes.

c.     Numerous "rodent excreta pellets" found on multiple pallets of food, including products such as Knorr Chicken Flavor Rice & Pasta Blend, Knorr Pasta Alfredo, Graffity Taffy, Chestnut Hill Self-Rising Flour, BiGS Taco Supreme Flavored Sunflower Seeds and Jell-O brand instant Chocolate Jello.

d.     "Multiple (no less than 5) rats climbing up rack scaffolding and through a pallet containing potato chips" in an area that had a "strong odor of rodent excreta and urine;"

e.     Many products that were gnawed on by rodents, such as tubs of Italian Pistachio & Vanilla Duo Spread, which had "gnaw holes."

f.     Some pet food products also had evidence of rodents, with bags of dog and cat food having gnaw holes in them.[15]

g.     Rodent droppings were also found on personal care items like Crest toothpaste and Listerine mouthwash.

Inspection Report at 1, 3-6, 9-10, 15.

80.     Additional findings included:

a.     Rodent droppings "too numerous to count ... on the floor of the north end of the shipping dock where product, including food, is stored" and in several areas throughout the facility;

b.     The ceiling tile and carpeting had to be removed in October 2021 from an office "due to the odor in the rooms" from the rodents. The report said that there was still a "putrid odor permeating the now cleared out room;"

c.     Several dead mice and rats, in addition to droppings too numerous to count

---

[15] Aimee Picchi, *"Rat carcasses on the conveyor belt": Grand Jury Subpoena over Family Dollar rat problem*, CBS NEWS (Mar. 15, 2022), https://www.cbsnews.com/news/family-dollar-warehouse-rats-product-recall-federal-grand-jury-subpoena-dollar-tree/.

d.    Inspectors watched as "two mice exited from gnawed-open product bags;"

e.    Pallets with food that had "significant nesting material" under them;

f.    A "distinct odor indicating a dead/decaying animal" in the unused conveyer belt system;

g.    "Significant gnawings" in addition to "too numerous to count" rat droppings and a "strong odor of rodent urine" on a pallet of mixed nuts. "Multiple bags of products were gnawed open and product was spilling out of cases onto lower levels of the pallet;"

h.    Pet and human food that was improperly stored and had gnaw-holes and rat droppings;

i.    Rotting garbage that could be smelled from 5 feet away;

j.    Trash that "was piled up to 1.5 feet tall and extended up to 2 feet out from the facility's walls;"

k.    Bird droppings that covered an area of the floor 1.5 feet wide and 3 feet long; and

l.    At least two dead birds.

*Id*. at 1, 2, 3, 6, 9-10, 11, 14, 16.

81.    The FDA's examination of Family Dollar's pest control records noted:

a.    Up to 107 mice from 2020 through June 2021 and up to 31 roof rats in areas that included human food storage;

b.    The company's bait boxes and glue traps captured 2,300 rodents between March and September 2021 alone;

c.    During January 7-12, 2022, 150 roof rats were captured;

d.    After fumigation during January 16-20, 2022, about 1,097 rodent carcasses were removed from the facility.

*Id*. at 7, 12.

82.    The Inspection Report indicates that Family Dollar has been aware of the rodent problem since **at least January 2020**. Inspection Report at 13. According to the report, the general manager told inspectors that when there was a fire drill, "dozens of rats could be seen running

around the facility due to the loud and sustained sound of the fire alarm." *Id.* Because the stench from the rodents was so bad in one part of the facility, the company even stopped using a breakroom and an inventory control center, the report said. *Id*.

83.    According to the FDA Safety Alert, which was based on the Inspection Report's findings:

> Today, the U.S. Food and Drug Administration is alerting the public that several categories of FDA-regulated products purchased from Jan. 1, 2021, through the present from Family Dollar stores in Alabama, Arkansas, Louisiana, Mississippi, Missouri, and Tennessee may be unsafe for consumers to use. The impacted products originated from the company's distribution facility in West Memphis, Arkansas, where an FDA inspection found insanitary conditions, including a rodent infestation, that could cause many of the products to become contaminated. The FDA is working with the company to initiate a voluntary recall of the affected products.

> "Families rely on stores like Family Dollar for products such as food and medicine. They deserve products that are safe," said Associate Commissioner for Regulatory Affairs Judith McMeekin, Pharm.D. "No one should be subjected to products stored in the kind of unacceptable conditions that we found in this Family Dollar distribution facility. These conditions appear to be violations of federal law that could put families' health at risk. We will continue to work to protect consumers."

> This alert covers FDA-regulated products purchased from Family Dollar stores in those six states from Jan. 1, 2021, through the present. Some examples of these products include human foods (including dietary supplements (vitamin, herbal and mineral supplements)), cosmetics (skincare products, baby oils, lipsticks, shampoos, baby wipes), animal foods (kibble, pet treats, wild bird seed), medical devices (feminine hygiene products, surgical masks, contact lens cleaning solutions, bandages, nasal care products) and over-the-counter (OTC) medications (pain medications, eye drops, dental products, antacids, other medications for both adults and children).

> Consumers are advised not to use and to contact the company regarding impacted products. The agency is also advising that all drugs, medical devices, cosmetics and dietary supplements, regardless of packaging, be discarded. Food in non-permeable packaging (such as undamaged glass or all-metal cans) may be suitable for use if thoroughly cleaned and sanitized. Consumers should wash their hands immediately after handling any products from the affected Family Dollar stores.

Consumers who recently purchased affected products should contact a health care professional immediately if they have health concerns after using or handling impacted products. Rodent contamination may cause Salmonella and infectious diseases, which may pose the greatest risk to infants, children, pregnant women, the elderly and immunocompromised people.

Following a consumer complaint, the FDA began an investigation of the Family Dollar distribution facility in West Memphis, Arkansas, in January 2022. Family Dollar ceased distribution of products within days of the FDA inspection team's arrival on-site and the inspection concluded on Feb. 11. Conditions observed during the inspection included live rodents, dead rodents in various states of decay, rodent feces and urine, evidence of gnawing, nesting and rodent odors throughout the facility, dead birds and bird droppings, and products stored in conditions that did not protect against contamination. More than 1,100 dead rodents were recovered from the facility following a fumigation at the facility in January 2022. Additionally, a review of the company's internal records also indicated the collection of more than 2,300 rodents between Mar. 29 and Sep. 17, 2021, demonstrating a history of infestation.

Safety Alert at 1-2.

84.    On the same day and for the first time, Family Dollar issued a "company announcement" indicating it was initiating a voluntary retail level product recall of "*certain products regulated by the [FDA]*" that were stored and shipped to 404 stores from Family Dollar Distribution Center 202 located at 1800 Family Dollar Parkway in West Memphis, Arkansas from January 1, 2021, through the present due to the presence of rodents and rodent activity at Family Dollar Distribution Center 202. *See* Company Announcement, FDA, Family Dollar Stores Issues Voluntary Recall of Certain FDA-Regulated Products in Six States Including Drugs, Devices, Cosmetics, Foods (Feb. 18, 2022), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/family-dollar-stores-issues-voluntary-recall-certain-fda-regulated-products-six-states-including#recall-announcement ("Company Announcement," attached hereto as Exhibit N) (emphasis added).

85.     In its Company Announcement, Family Dollar acknowledged the health and safety concerns arising from the Rodent Infestation:

> There are numerous hazards associated with rodents including the potential presence of *Salmonella.* Use or consumption of affected products may present risk of illness due to the potential presence of *Salmonella*, an organism which can cause serious and sometimes fatal infections in infants, young children, frail or elderly people, pregnant persons, persons with pre-existent pathology (*e.g.*, patients with cancer undergoing chemotherapy treatments, organ transplant recipient, etc.) and others with weakened immune systems. Healthy persons infected with *Salmonella* often experience fever, diarrhea (which may be bloody), nausea, vomiting and abdominal pain. In rare circumstances, infection with *Salmonella* can result in the organism getting into the bloodstream and producing more severe illnesses such as arterial infections (*i.e.*, infected aneurysms), endocarditis and arthritis.

Company Announcement at 2. The Company Announcement did not mention the risk of other rodent-causing diseases, such as HPS, Leptospiroris, LCM, or Rat-Bite Fever. Similarly, the Company made no mention of substandard pest control measures, unsanitary conditions, and the failure to properly warehouse or store products.

86.     Despite the fact that non-FDA regulated products are also stored at the Distribution Center, Defendants' voluntary recall is limited to only certain FDA-regulated products:

> Products covered by this retail level recall include all: (i) drugs; (ii) medical devices; (iii) cosmetics; (iv) dietary supplements; and (v) human and animal (pet) food products. The recall does not apply to products shipped directly to the stores by the distributor or manufacturer, such as all frozen and refrigerated items. The 404 stores to which this recall applies are listed on the attached schedule. The recall does not apply to other store locations.

*Id.*

87.     Findings in the Inspection Report and the FDA Safety Alert are corroborated by independent inspections conducted by the Arkansas Department of Health ("ADH").

88.     In February 2021, the ADH received a complaint that the Distribution Center "has a problem with termites, rats, mice falling out of boxes, and running all over the place."   A

subsequent inspection conducted by Inspector Louis Nevala of the Arkansas Department of Health

on March 3, 2021, revealed:

> Effective measures are not being taken to exclude vermin or pests from the warehouse areas and protect against the contamination of food on the premises by vermin or pests. Specifically, I observed significant rodent activity on aisles 28-34 where human and pet food is stored. I observed live and dead rodents in this area. I observed products that had been contaminated by rodents.

Manufactured/Wholesale Food Inspection Report at 1, Ark. Dept. of Health, Env't. Health

Prot. Servs. (Mar. 3, 2021) (attached hereto as Exhibit O).

89.     Family Dollar did not undertake sufficient efforts to remedy the Rodent Infestation.

Just one month later, on April 2, 2021, Inspector Nevala noted once again that:

> Effective measures are not being taken to exclude vermin or pests from the warehouse areas and protect against the contamination of food on the premises by vermin or pests. Specifically, I observed rodent activity on aisles 28-34 where human and pet food is stored. I observed live rodents in this area. I observed products that had been contaminated by rodents.

Manufactured/Wholesale Food Inspection Report at 1, Ark. Dept. of Health, Env't. Health

Prot. Servs. (Apr. 2, 2021) (attached hereto as Exhibit P).

90.     Additionally, in April 2021, Family Dollar had knowledge that rodents were being

brought into retail stores from its distribution facilities. Over the objection of the retail store

managers, Family Dollar's corporate management urged at least one retail store to reopen before

pest control and fumigation companies could adequately treat the store to remove the rats.  *See*

Email chain between Tamara Almand, Central Region Environmental Manager, Ark. Dept. of

Health and Chris McDaniel, Environmental Health Specialist, Lonoke County Health Unit –

Cabot, re: Family Dollar (Apr. 7-8, 2021) (attached hereto as Exhibit Q). This is consistent with

the Inspection Report, which noted that "Your firm has also received reports from stores of product

being shipped from your Distribution Center with rodent excreta pellets and/or that was gnawed/chewed." Inspection Report at 19.

91.     According to Family Dollar's Family Dollar's Interrogatory Responses, on November 11, 2021, its pest control company at the time, Rentokil, reported that the facility had "more of a population" of rats "than expected." Exhibit J, Family Dollar's Response to Plaintiffs' Interrogatory No. 6 at 16-18.

92.     Rentokil's service records show that Family Dollar was aware of an increasing rodent problem as early as November 2019. *See* Rentokil Proof of Service, Nov. 7, 2019, Exhibit B. During a visit on November 21, 2019, Rentokil identified "identified gaps under doors. This provides an entry point for rodents and other pests," and noted that Family Dollar was monitoring rodent activity at the Distribution Center by requesting "a list of all catchings at the end of each week . . . with [the] purpose of customers being able to forward list to their managers." Rentokil Proof of Service, Nov. 21, 2019, Exhibit C at MDL.RNAINC00000168-69.

93.     Rentokil continued to identify rodent problem areas that needed to be addressed by Family Dollar throughout 2021, including, but not limited to, gaps that allowed pest access, accumulation of food products and non-food that attracted pests, debris accumulation in and around dumpsters and compactors that attracted pests, and cracks or damage to exterior walls allowing pest access. *See* Rentokil Proof of Service, Mar. 17, 2021, Exhibit D at MDL.RNAINC00001499-501.

94.     Photos from the March 17, 2021 service show the derelict conditions at the Distribution Center:

 

"Debris collecting in and around dumpster/compactor. Please remove debris to prevent unsanitary conditions and attraction by pests." *Id.* at MDL.RNAINC00001499.

95.     In May 19, 2021, Rentokil reported that it had set a staggering "**600 glueboards…between aisles 36 and 41**." Rentokil Proof of Service, May 19, 2021, FD_MDL_00001375-76 (attached hereto as Exhibit R) (emphasis added).

96.     Photos from Rentokil's May 2021 service are no better, with the service technician noting that he spent his entire visit just on aisle 1 of the Distribution Center. *See* Rentokil Proof of Service, July 2, 2021, Exhibit E at MDL.RNAINC00001966.





"An accumulation of food product from damaged goods noted. Please remove food product to prevent attraction by pests." *Id.* at MDL.RNAINC00001960.

97.     In a December 23, 2021 service report, Rentokil noted that Family Dollar employees observed a "high activity" of rodents." Rentokil Proof of Service, Dec. 23, 2022, FD_MDL_00001080-1081 (attached hereto as Exhibit S) ("Around 20 roof rats…running the racks and pallets.").

98.     On November 29, 2021, Ecolab pest control provided Family Dollar with a report titled "28 Issues Identified" which stated, among other things, that rats had "full run of the facility" and were "running" on storage rack beams to move around the Distribution Facility as depicted in this photograph:



Ecolab Report, Exhibit F at ECOLAB_000130 (red circles in original).

99.     Ecolab provided Family Dollar with photographs of what it described as "Rodent runs with oil marks" in the storage racks as depicted here:



*Id.* at ECOLAB_000134 (red circle in original).

100.   In addition to producing the Ecolab Report, Ecolab also produced dozens of 2022

Customer Service Reports.

101.   In a Customer Service Report dated April 5, 2022, Ecolab stated:

> Recommend starting at aisle 1 and work thru all aisles, pull all pallets from top row and work your way down row by row to remove ALL old rodent droppings.

Ecolab Customer Service Report, Exhibit G at ECOLAB_000061.

102.   In a Customer Service Report dated January 20, 2022, Ecolab warned Family

Dollar that:

> -the following overhead door(s) do not seal properly to keep pests out. 95%of overhead doors do not seal, seals recently installed do not seal properly.

Ecolab Customer Service Report, Exhibit H at ECOLAB_000011.

103.     Findings reported in the FDA's Investigation Report and Safety Alert, the ADH materials, Ecolab Report and Customer Service Reports, and Rentokil materials, have been corroborated by Family Dollar employees themselves (who were subjected to the Rodent Infestation first-hand). For instance, in early January 2022, Mr. Robert Bradford, then a Family Dollar employee at the Distribution Center, posted videos and photographs of numerous rats inside the building, some of which were obtained by news station WREG Memphis.[16] Mr. Bradford claims he was fired after posting a video of him trying to feed a rat online and stated the rats were everywhere inside the Distribution Center: "There are sixty-one aisles in the warehouse; you are going to see them from one to sixty-one. They are running around. They are on the floor, and they are in boxes."

104.     Photos captured from Mr. Bradford's video and featured by WREG Memphis are below:[17]



---

[16] Melissa Moon, *Another complaint about rats at Family Dollar Facilities*, WREG Memphis (Jan. 4, 2022), https://wreg.com/nes/local/another-complaint-about-rats-at-family-dollar-facilities/
[17] *Id*.



105.    WREG Memphis and other news outlets have continued to feature videos of rats

from inside the Distribution Center:[18]



---

[18] *See e.g.*, Jordan James, *Over 1,000 dead rodents found at Family Dollar distribution center*, WREG Memphis (Feb 19, 2022), https://wreg.com/news/local/over-1000-dead-rodents-found-at-family-dollar-distribution-center/.



106.    Additional photos obtained from a confidential witness depicting conditions inside the Distribution Center are attached hereto as Exhibit H.

107.    Family Dollar's conduct has endangered its customers. As discussed herein, there are numerous potentially severe hazards associated with rodents.[19]

108.    Family Dollar was familiar with the serious health dangers and risks associated with rodents. On May 2, 2017, it issued a detailed "Rodent Infestation Cleaning Procedure" to its stores explaining how to dispose of, rodent droppings, urine, and nesting materials:

Cleaning Process

- While cleaning, ALWAYS wear rubber, nitrile gloves, eye protection and a dust mask…from the shelves and charge accordingly.
- DO NOT stir up dust by sweeping up droppings, urine or nesting materials.
- Prepare a disinfectant solution of 1 part bleach to 10 parts water.

…

Cleaning Up Urine and Droppings

---

[19] CDC, Diseases directly transmitted by rodents, https://www.cdc.gov/rodents/diseases/direct.html (last accessed Aug. 10, 2022).

- Spray all areas that show signs of urine or droppings with the bleach/water disinfectant and <u>let soak in for 5 minutes</u>.
- Carefully use paper towels to clean up the urine and droppings and then thrown away the materials into a trash can.
- Once the area has been cleaned up, thoroughly spray and clean the surrounding fixtures and surfaces that may have come into contact with the urine or droppings.

Cleaning Up Dead Rodents or Nests

- When a dead rodent or nest is found, disinfect it by thoroughly spraying with bleach/water disinfectant solution and <u>let soak for 5 minutes</u>.
- Wearing gloves, place the dead rodent or nesting materials in a zip-lock plastic bag and seal tightly.
- Place that bag into a second zip-lock bag and dispose of in a covered trash can that is emptied daily.

Dollar Tree | Family Dollar Rodent Infestation Cleaning Procedure, May 2, 2017 at FD_MDL_00001749-1752 (attached hereto as Exhibit T). Ironically, Family Dollar's February 18, 2022 Company Announcement and recall does not mention any of these procedures and/ or dire warnings.

109.    In an e-mail dated April 7, 2021, an Arkansas Department of Health staffer discussing a rodent infestation at a Family Dollar store located in Cabot, Arkansas[20] discussed the serious hazards associated with rodents:

> In the course of treatment he has also found that the rats have gotten into the air ducts. I am not sure if that is a problem Ecolab will handle, or if it needs to be done by another company. **My concern is the possibility of an imminent health hazard to the public due to Junta virus**. I know from my college days that it is aerosolized and is transmitted by rodents.

*See* Email chain between Tamara Almand and Chris McDaniel, Exhibit Q at 5 (emphasis added).

110.    Use or consumption of affected products may present risk of illness due to the potential presence of Salmonella, an organism which can cause serious and sometimes fatal

---

[20] At this time, it is unclear how this Cabot's store infestation is associated with the Rodent Infestation.

infections in infants, young children, frail or elderly people, pregnant persons, persons with pre-existent pathology (*e.g.*, patients with cancer undergoing chemotherapy treatments, organ transplant recipient, etc.) and others with weakened immune systems. Healthy persons infected with Salmonella often experience fever, diarrhea (which may be bloody), nausea, vomiting and abdominal pain. In rare circumstances, infection with Salmonella can result in the organism getting into the bloodstream and producing more severe illnesses such as arterial infections (*i.e.*, infected aneurysms), endocarditis and arthritis.

111.    Another danger associated with rodents is Hantavirus Pulmonary Syndrome or HPS. HPS is s a severe, sometimes fatal, respiratory disease in humans caused by infection with hantaviruses. According to the Centers for Disease Control and Prevention ("CDC"), ways rodents may spread hantavirus to people include:

- Airborne transmission, which occurs when fresh rodent urine, droppings, or nesting materials are stirred up, tiny droplets containing the virus get into the air.

- Direct contact with rodents or their urine and droppings

- Eating food contaminated by urine, droppings, or saliva from an infected rodent.[21]

Anyone who comes into contact with rodents that carry hantavirus is at risk of HPS.

112.    Leptospiroris can also be caused by human contact with urine from infected rodents.[22] The bacteria can enter the body through skin or mucous membranes (eyes, nose, or mouth), especially if the skin is broken from a cut or scratch.[23] Without treatment, Leptospirosis

---

[21] CDC, Transmission How People Get Hantavirus Infection, https://www.cdc.gov/hantavirus/hps/transmission.html (last accessed Aug. 5, 2022); CDC, Diseases directly transmitted by rodents, https://www.cdc.gov/rodents/diseases/direct.html (last accessed Aug. 5, 2022).
[22] CDC, Leptospirosis, Infection, https://www.cdc.gov/leptospirosis/infection/index.html, (last accessed Aug. 5, 2022)
[23] *Id.*

can lead to kidney damage, meningitis (inflammation of the membrane around the brain and spinal cord), liver failure, respiratory distress, and even death.

113.    Other diseases associated with contact with infected rodent urine or droppings include:

- Lymphocytic Chorio-meningitis (LCM), which spreads by breathing in dust that is contaminated with rodent urine or droppings;

- Rat-Bite Fever, which spreads by contact with a dead rodent or eating food contaminated by rat feces; and

- Hepatitis C, from E. Coli bacteria, which can cause liver failure;

114.    Studies have shown that rats can carry up to 53 different infectious agents.[24] Additionally, a 2014 report found that nearly all rodents in the study had a bacterial infection, and about 40% had at least one viral infection; several of which were contaminated with more than five viruses.[25]

115.    Because of the unsanitary conditions, rodent infestation, and related health hazards, the FDA advised that all FDA-regulated products sold by certain Family Dollar stores in Alabama, Arkansas, Louisiana, Mississippi, Missouri and Tennessee from January 1, 2021, through present are not fit for human use or consumption, including:

a.    **Human foods** (including dietary supplements (vitamin, herbal and mineral supplements));

---

[24] Strand TM, Lundkvist Å. Rat-borne diseases at the horizon. A systematic review on infectious agents carried by rats in Europe 1995-2016. Infect Ecol Epidemiol. Feb. 27, 2019.
[25] Justin Worland, *Here Are The Diseases in NYC Rats*, Time (Oct. 14, 2014), *available at* https://time.com/3507898/nyc-rats-diseases/ (citing Firth, et al., Detection of Zoonotic Pathogens and Characterization of Novel Viruses Carried by Commensal Rattus norvegicus in New York City, ASM Journal. Oct. 14, 2014.) (according to the study: "To begin to explore the zoonotic disease risk posed by urban rat populations, we trapped and surveyed Norway rats collected in New York City over a 1-year period. This analysis revealed a striking diversity of known pathogens and novel viruses in our study population, including multiple agents associated with acute gastroenteritis or febrile illnesses in people.") (Study attached hereto as Exhibit U).

b.     **Cosmetics** (skincare products, baby oils, lipsticks, shampoos, baby wipes), animal foods (kibble, pet treats, wild bird seed);

c.     **Medical devices** (feminine hygiene products, surgical masks, contact lens cleaning solutions, bandages, nasal care products);

d.     **Over-the-counter** (OTC) medications (pain medications, eye drops, dental products, antacids, other medications for both adults and children); and

e.     **Any other FDA-regulated products**.[26]

FDA Safety Alert at 1 (emphasis added).

116.   The conditions at the Distribution Center were such that all products in the categories noted above were deemed contaminated by the FDA, regardless of whether the product packaging showed signs of contact with rodents, birds, or their excrement or the packaging itself actually came into contact with the rodents, birds, or excrement. Of course, the FDA could only advise as to unworthiness for human consumption for the products it has the authority to regulate.

117.   As noted by the FDA Safety Alert, the Rodent Infestation was spread throughout the Distribution Facility, which included products not regulated by the FDA. Indeed, the Inspection Report notes that "[t]here was a foul stench/ odor indicative of a dead and decaying animal in the pallet of clothing/apparel . . ." Inspection Report at 14. As such, all of the Contaminated Products were considered dangerous and unfit for human consumption or use due to the manner in which they were stored at the Distribution Center.

118.   Additionally, the Inspection Report states that the Rodent Infestation was not limited to one area of the Distribution Center and instead concerned a massive contamination that affected every area of the Distribution Center (inside and out), compromising all of its products. Rodent infestation and activity was observed and documented by FDA inspectors in the "northwest," "northeast," "southwest," "southeast," and "center" of the Distribution Center.

---

[26] *Id.*

43

Inspection Report at 2, 4, 5, 10, 15.

119.    The FDA reported that issues were found "*throughout the entirety of your facility*

including where human food is routinely stored" and gnaw holes, nesting materials, and rodent

carcasses "were also observed in all four corners and the center of the warehouse." *Id.* at 1, 10

(emphasis added).

120.    The FDA Safety Alert warned that anyone who purchased a FDA-regulated product

and experiences health concerns should contact a health care professional right away.[27] For

individuals who still have the products in their homes, the FDA advised that these products should

be thrown away:

> Consumers are advised not to use and to contact the company regarding impacted
> products. The agency is also advising that *all drugs, medical devices, cosmetics,*
> *and dietary supplements, regardless of packaging, be discarded. Food in non-*
> *permeable packaging (such as undamaged glass or all-metal cans) may be*
> *suitable for use if thoroughly cleaned and sanitized.* Consumers should wash their
> hands immediately after handling any products from the affected Family Dollar
> stores.

*Id.* at 1-2 (emphasis added).

121.    As a result of the FDA's Inspection Report, which exposed its violative conduct,

Family Dollar issued a "voluntary recall." *See* Company Announcement at 2. The Recall Notice

advised that "[c]ustomers that may have bought affected product may return such product to the

Family Dollar store where they were purchased without receipts." *Id.* at 2. The Company

Announcement noted that "[p]roducts shipped directly to the store by the distributor or

manufacturer aren't included, such as all frozen and refrigerated items." *Id.*

122.    As described herein, Plaintiffs and Class Members are not aided by Family Dollar's

defective recall for many reasons.

---

[27] *Id.*

123.    In addition to issuing a recall, Family Dollar was forced to close the 404 Affected

Stores that received shipments from the Distribution Center:[28]



124.    Plaintiffs and Class Members were unaware of the rate infestation, improper pest

control measures, and other unsanitary conditions and these omissions are and would be material

to reasonable and ordinary purchasers.  In addition to the omissions, Plaintiffs and Class Members

relied upon representations by Family Dollar concerning the safety, merchantability, and quality

of its products.

125.    Plaintiffs and Class Members paid money for the Contaminated Products.

---

[28] Vimal Patel, *Rodent Infestation at Family Dollar Warehouse Leads to Hundreds of Closures*,
NY Times (Feb. 19, 2022), https://www.nytimes.com/2022/02/19/us/fda-familydollar-recall.html;
Annabelle Timsit, *Family Dollar closes 400 stores, recalls products after FDA finds decaying
dead rodents in warehouse*, Washington Post (Feb. 20, 2022),
 https://www.washingtonpost.com/nation/2022/02/20/family-dollar-recall-fda-rodents/;    Parker
King, et al., *Hundreds of Family Dollar stores closed due to rodent infestation*, KSLA News 12
(Feb.  20,  2022),  https://www.wdtv.com/2022/02/20/hundreds-familydollar-stores-closed-due-
rodent-infestation/.

126.     Family Dollar unreasonably delayed issuing a recall of the Contaminated Products. Family Dollar has been aware of the problems with the Distribution Center since at least January 2020, and the rodent infestation and unsanitary conditions described by the FDA must have been obvious to all those that entered the facility. This delay prevented Plaintiffs and class members from taking advantage of money back guarantees for their purchases and prevented them from choosing not to purchase products with the omitted risk characteristics unless and until the warehouse had been adequately rid of rodents and pests.

127.     As illustrated herein, there is evidence that Family Dollar was on notice about issues with rats before March 2021, and Family Dollar has a disturbing history of rat infestations in its stores throughout the country.[29]

128.     Additionally, the lack of general pest control and unsanitary conditions within the Distribution Center were immediately obvious to anyone who entered the facility. Defendants were

---

[29] Michele Reese, *Complaints Lead to Deep Cleaning at Downtown Family Dollar*, WREG Memphis (Jan. 27, 2014), https://wreg.com/news/complaints-lead-to-deep-cleaning-at-downtown-family-dollar/; WRIC Newsroom, *2 local Family Dollar stores shut down to deal with rat infestations after 8News investigation*; WRIC News (June 19, 2018), https://www.wric.com/news/taking-action/2-local-family-dollar-stores-shut-down-to-deal-with-rat-infestations-after-8news-investigation/; Darcy Spears, *Rats land 2 Family Dollar Stores on Dirty Dining*, KTNV (May 1, 2019), https://www.ktnv.com/dirtydining/rats-land-two-family-dollar-stores-on-dirty-dining; Sarafina Jones, *Man claims rat infestation at Polk County Family Dollar*, WFLA, Auburndale, Fla. (Jun. 17, 2019), https://www.wfla.com/news/polk-county/man-claims-rat-infestation-at-polk-county-family-dollar/; Luke Jones, *Inspection report reveals disturbing details about rat infestation at Family Dollar store*, WREG Memphis (Jul. 23, 2019), https://wreg.com/news/inspection-report-reveals-disturbing-details-about-rat-infestation-at-family-dollar-store/; Sierra Webster, *Rat Infestation Shuts Down Family Dollar in Cobb County*, The Atlanta Journal Constitution (July 29, 2019), *available at*: https://www.ajc.com/news/breaking-news/rat-infestation-shuts-down-family-dollar-cobb-county/5ZADCF7OcO9lRL4FQ87LAI/; Bria Jones, *Family Dollar worker says store infested with rats*, WREG Memphis (Jan. 3, 2022), https://wreg.com/news/local/family-dollar-worker-says-store-infested-with-rats/.

aware of and otherwise on notice of the Rodent Infestation that led to the contamination of products within the Distribution Center.

129.    Hiring cleaning crews, professional exterminators, and fumigation is expensive when properly done and would impact Defendants' profits as part of Family Dollar's cost control measures or as a result in the Distribution Center being shut down, so Defendants failed to take the necessary steps to address the rodent infestation to maximize profits.

130.    As a result of its deceptive and unfair conduct, Family Dollar's parent company, Defendant Dollar Tree, was served with a federal grand jury subpoena out of the Eastern District of Arkansas on March 15, 2022.[30]

131.    On May 18, 2022, Family Dollar announced that it was closing the Distribution Facility, with plans to ship to its retail stores until the end of June, transfer inventory to other distribution centers by August, and cease operations by October 2022.  However, employees responsible for winding down operations at the Distribution Center report that the rats are back, that "rat sightings are again common," that "you still smell rat feces and urine," and that they beep vehicle horns to ward off rodents in their way, only six months after Family Dollar's voluntary recall.[31]

132.    Family Dollar concealed the truth about the conditions of the Distribution Center in order to remain operational, continue to sell Contaminated Products, and otherwise maximize

---

[30] *Dollar Tree discloses federal grand jury subpoena over pest issue*, REUTERS, (Mar. 16, 2022), https://www.reuters.com/business/retail-consumer/dollar-tree-discloses-federal-grand-jury-subpoena-over-pest-issue-2022-03-15/#:~:text=March%2015%20(Reuters)%20%2D%20Dollar,at%20its%20Family%20Dollar%20division.

[31] Brendan Case, *Rat-Plagued Warehouse Winds Down as Family Dollar Faces Lawsuits*, BLOOMBERG, (Jul. 20, 2022), https://www.bloomberg.com/news/articles/2022-07-20/rat-infested-family-dollar-dltr-warehouse-leads-to-recalls-and-lawsuits.

profits but failed to take reasonable steps to remedy the rodent infestation. As a result, consumers continued purchasing Contaminated Products.

133.    The unsanitary condition of the Contaminated Products manifested before the Contaminated Products were purchased by Plaintiffs and Class Members.

134.    The Contaminated Products were defective and unreasonably dangerous at the time they were purchased by Plaintiffs and Class Members. No ordinary or reasonable consumer would have purchased the Contaminated Products had they known the truth about them.  Nor would any ordinary consumer with ordinary knowledge common to the community foresee the risks posed by the Contaminated Products and no reasonably prudent manufacturer or seller would market and sell the Contaminated Products.

135.    Put simply, no reasonable consumer would purchase a product that has been contaminated with rodent excrement, rendering the Contaminated Products worthless, regardless of any potential health risks. At the least, a reasonable consumer would have not have paid the full purchase price for the Contaminated Products and instead would have paid less for the Contaminated Products knowing that they would have to expend time and energy cleaning the purchased products.

136.    Because of the improper conditions in which they were stored, the Contaminated Products are worthless, and Plaintiffs and Class Members did not receive any benefit from the Contaminated Products.

137.    The health hazards associated with rodent infestation render the contaminated products not only worthless but, in many cases, hazardous to human health.

138.     Because the Contaminated Products came into contact with other products in Plaintiffs and Class Members' homes, Plaintiffs and Class Members must discard additional products as well.

## V.     <u>FRAUDULENT OMISSION ALLEGATIONS</u>

139.     Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Family Dollar responsible for disseminating unfair, deceptive, and misleading marketing materials regarding the Contaminated Products or those responsible for intentionally omitting the truth of the Rodent Infestation from Plaintiffs and class members. Defendants are necessarily in possession of all this information. Plaintiffs' claims arise out of Defendants' fraudulent omission of the Rodent Infestation.

140.     Plaintiffs allege that at all relevant times, including specifically at the time they and Class Members purchased the Contaminated Products, Defendants knew, should have known, or were reckless in not knowing of the Rodent Infestation; Defendants had a duty to disclose material facts and information to consumers, such as the Rodent Infestation, improper pest control, and improper storage of products, based upon its exclusive knowledge and the ongoing health risk posed to consumers; but Defendants never disclosed the Rodent Infestation or any other issue to Plaintiffs, Class Members, or the general public other than its halfhearted, inadequate recall of some products.   These omissions prevented Plaintiffs and the Class Members from taking advantage of the 30-day return policy.

141.     Plaintiffs make the following allegations as specific as reasonably possible:

    a.     **Who:** Defendants actively omitted information concerning the existence of the Rodent Infestation, pest control issues, improper storage practices, and associated risks from Plaintiffs and Class Members at the point of sale or thereafter.  Defendants' agents should have and could have disclosed the

Rodent Infestation.  As to Plaintiffs themselves, Defendants should have and could have disclosed the Rodent Infestation at the time they purchased the Contaminated Products or thereafter.

b.    **What:** Defendants knew, should have known, or were reckless in not knowing, that the Contaminated Products were exposed to Salmonella and other infectious diseases due to the Rodent Infestation. Despite their knowledge, Defendants *failed to disclose the Rodent Infestation* at the point of sale or thereafter.

c.    **When:** Defendants' omissions began *from at least the start of the Class period and continue to this day*. Defendants have never taken any action to inform Plaintiffs, Class Members, or the general public of the true nature of the Rodent Infestation. As to Plaintiffs themselves, Defendants have continually omitted the true nature of the Rodent Infestation for the entirety of the relevant time period, including at the point of sale.

d.    **Where:** Defendants' omissions occurred *in every commun*ication it had with Plaintiffs, Class Members, and the general public. As to Plaintiffs themselves, Defendants' omissions occurred in every communication it had with Plaintiffs about the Contaminated Products, including all communications that happened before, at the point of and after their purchases of the Contaminated Products.

e.    **How:** Defendants *omitted and failed to disclose* the Rodent Infestation to Plaintiffs, Class Members, or the general public at the point of sale or thereafter via a press release, permanent warnings affixed to the Contaminated Products, direct mail campaign, or otherwise.  As to Plaintiffs themselves, Defendants omitted and failed to disclose the Rodent Infestation in any communication or point of sale document.

f.    **Why:** Due to corporate greed, Defendants omitted the Rodent Infestation to deceive Plaintiffs, Class Members, and the general public into buying Products to *maximize its profits and further its cost-cutting measures*. Furthering its goal to maximize profits, Defendants failed to notify Class Members of the true nature of the Rodent Infestation to avoid an avalanche of requests to refund Product purchases per the 30-day policy.  As to Plaintiffs themselves, Family Dollar omitted the Rodent Infestation, pest control issues, improper storage practices, and associated risks to deceive them into purchasing the Contaminated Products, thereby maximizing Defendants' profits and to avoid refunding the cost of the Contaminated Products.

g.    **Association, Nexus, and Causation:** Because Defendants failed to disclose the Rodent Infestation, despite its extensive knowledge, Plaintiffs and Class Members purchased Products that did not or will not safely perform and as such are worth less than one that does safely perform. Had Defendants

disclosed the Rodent Infestation, Plaintiffs and other Class Members would not have purchased the Contaminated Products, lost the opportunity to return the products per the 30-day policy, or certainly would have paid less for the Contaminated Products.

## VI.   TOLLING OF STATUTES OF LIMITATIONS

142.   Defendants were and remain under a continuing duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Contaminated Products, that the Contaminated Products were exposed to contamination by virtue of the Rodent Infestation, and that the Rodent Infestation poses a health and safety concern to consumers and diminishes the value of the Contaminated Products.

143.   As a result of this active concealment by Defendants, all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

### A.   DISCOVERY RULE TOLLING

144.   Class Members had no way of knowing about the Rodent Infestation and the other information concealed by Defendants.

145.   Within the time period of any applicable statutes of limitation, Plaintiffs and the Class Members could not have discovered through the exercise of reasonable diligence that Defendants were concealing the Rodent Infestation.

146.   Plaintiffs and the Class Members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Defendants did not report information within their knowledge to federal authorities (including the FDA), their stores or consumers, nor would a reasonable and diligent investigation have disclosed that Defendants had information in their possession about the existence and dangerousness of the Rodent Infestation and opted to conceal that information until shortly before this action was filed.

147.    All applicable statutes of limitation have been tolled by operation of the discovery rule.

**B.    FRAUDULENT CONCEALMENT TOLLING**

148.    All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

149.    By failing to disclose the Rodent Infestation of which it was aware, Family Dollar disregarded the safety of consumers who purchased the Contaminated Products.

**C.    ESTOPPEL**

150.    Defendants were under a continuous duty to disclose to Plaintiffs and the Class Members the true character, quality, and nature of the Rodent Infestation and the contamination risks it posed to Products.

151.    Defendants knowingly, affirmatively, and actively concealed the Rodent Infestation and, thereby, the true nature, quality, and character of the Contaminated Products from consumers, as well as the fact that the Rodent Infestation systematically devalued the Contaminated Products and undermined consumer safety.

152.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

**VII.    CLASS ACTION ALLEGATIONS**

153.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure Rule 23(a) and (b)(3) seeking damages pursuant to the common law, consumer protection and other statutory laws of the states listed below, on behalf of the following classes:

Nationwide Class
All persons who, from January 1, 2020 through February 18, 2022, purchased one of the

Contaminated Products from an Affected Store in an Affected State; or, in the alternative, the following state classes:

Alabama Class
All persons residing in the state of Alabama who, from January 1, 2020 through February 18, 2022, purchased one of the Contaminated Products from an Affected Store in Alabama. Family Dollar.

Arkansas Class
All persons residing in the state of Arkansas who, from January 1, 2020 through February 18, 2022, purchased one of the Contaminated Products from an Affected Store in Arkansas

Louisiana Class
All persons residing in the state of Louisiana who, from January 1, 2020 through February 18, 2022, purchased one of the Contaminated Products from an Affected Store in Louisiana.

Mississippi Class
All persons residing in the state of Mississippi who, from January 1, 2020 through February 18, 2022, purchased one of the Contaminated Products from an Affected Store in Mississippi.

Missouri Class
All persons residing in the state of Missouri who, from January 1, 2020 through February 18, 2022, purchased one of the Contaminated Products from an Affected Store in Missouri.

Tennessee Class
All persons residing in the state of Tennessee who, from January 1, 2020 through February 18, 2022, purchased one of the Contaminated Products from an Affected Store in Tennessee.

(Collectively referred to herein as the "Classes").

154.    Excluded from the Classes are Defendants, Defendants' agents, employees, parents, officers, predecessors, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates of Defendants, Class Counsel and their employees, and the judicial officers and their immediate family members and associates court staff assigned to this case.

155.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive

relief pursuant to the common law of unjust enrichment and the state consumer protection laws identified herein.

156.    Plaintiffs reserve the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time, or to propose subclasses, in response to facts learned through discovery, legal arguments advanced by Defendants, or otherwise.

157.    <u>Numerosity—Fed. R. Civ. P. 23(a)(1)</u>. The Classes are comprised of tens thousands of individuals who were Defendants' customers, the joinder of which in one action would be impracticable.  The exact number or identification of the Class Members is presently unknown. The identity of the Class Members is ascertainable and can be determined based on Defendants' records.

158.    <u>Predominance of Common Questions—Fed. Civ. P. 23(a)(2), 23(b)(3)</u>. The questions of law and fact common to the Classes predominate over questions affecting only individual Class Members, and include, but are not limited to, the following:

      (a)    whether Defendants owed a duty of care;

      (b)    whether Defendants knew or should have known that the Rodent Infestation existed;

      (c)    whether Defendants knew or should have known that the Rodent Infestation posed health and safety risks to consumers;

      (d)    whether Defendants failed to disclose the Rodent Infestation;

      (e)    whether Defendants' failure to disclose the Rodent Infestation is material to a reasonable consumer;

      (f)    whether Defendants' failure to disclose the Rodent Infestation was false, deceptive, and misleading;

      (g)    whether Defendants had knowledge that those omissions were false, deceptive, and misleading;

      (h)    whether Defendants' failure to disclose the Rodent Infestation is likely to deceive a reasonable consumer;

(i)      whether Defendants continue to fail to adequately disclose the Rodent Infestation to consumers;

(j)      whether Defendants' continued to failure to adequately disclose the Rodent Infestation is likely to mislead, deceive, confuse, or confound consumers acting reasonably;

(k)     whether Defendants' representations and/ or promises in advertising, warranties, packaging, and/or labeling are false, deceptive, and misleading;

(l)      whether those representations are likely to deceive a reasonable consumer;

(m)    whether Defendants had knowledge that those representations were false, deceptive, and misleading;

(n)     whether Defendants continue to disseminate those representations despite knowledge that the representations are false, deceptive, and misleading;

(o)     whether Defendants' marketing and advertising of the Contaminated Products are likely to mislead, deceive, confuse, or confound consumers acting reasonably;

(p)     whether Defendants violated State consumer protection laws; and

(q)     whether Plaintiffs and the members of the Classes are entitled to declaratory and injunctive relief.

159.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other members of the Classes. Identical statutory violations and business practices and harms are involved.  Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

160.    <u>Typicality—Fed. R. Civ. P. 23(a)(3)</u>.  Plaintiffs' claims are typical of those of the members of the Classes in that they are based on the same underlying facts, events, and circumstances relating to Defendants' conduct.

161.    <u>Adequacy—Fed. R. Civ. P. 23(a)(4); 23(g)(1)</u>.  Plaintiffs will fairly and adequately represent and protect the interests of the Classes, have no interest incompatible with the interests of the Classes, and have retained counsel competent and experienced in class action, consumer

protection, and false advertising litigation.

162.     <u>Predominance —Fed. R. Civ. P. 23(b)(3)</u>. Questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes.

163.     <u>Superiority—Fed. R. Civ. P. 23(b)(3)</u>.  A class action is the best available method for the efficient adjudication of this litigation because individual litigation of Class Members' claims would be impracticable and individual litigation would be unduly burdensome to the courts. Plaintiffs and members of the Classes have suffered irreparable harm as a result of Defendants' bad faith, fraudulent, deceitful, unlawful, and unfair conduct.  Because of the size of the individual Class Members' claims, no Class Member could afford to seek legal redress for the wrongs identified in this Complaint.  Without the class action vehicle, the Classes would have no reasonable remedy and would continue to suffer losses, as Defendants continue to engage in the bad faith, unlawful, unfair, and deceptive conduct that is the subject of this Complaint, and Defendants would be permitted to retain the proceeds of their violations of law.  Further, individual litigation has the potential to result in inconsistent or contradictory judgments.  A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

164.     Plaintiffs seek, in the alternative or prior to certification, an Issues Class.

165.     Rule 23(c)(4) provides that an action may be brought or maintained as a class action with respect to particular issues.

166.     Pursuant to Rule 23(c)(4), Plaintiffs bring this action on behalf of themselves and of all others similarly situated to resolve, *inter alia*, several important issues:

    a.      Whether Defendants acted negligently;

    b.      Whether Defendants committed *negligence per se*;

    c.      Whether Defendants failed to adequately warn Plaintiffs and the Classes;

d.      Whether the Contaminated Products were fit for their ordinary use;

e.      Whether the Contaminated Products conformed to the promises and affirmations of fact made on their packages and labels;

f.      Whether Defendants omitted material facts about the Contaminated Products;

g.      Whether Defendants knowingly, fraudulently, and actively misrepresented, omitted and concealed from consumers material facts relating to the quality of their Products;

h.      Whether Defendants made misrepresentations about the Contaminated Products;

i.      Whether Defendants were unjustly enriched by their conduct;

j.      Whether Defendants are liable for civil theft and deception under Arkansas law; and

k.      Whether Defendants violated the Affected States' consumer protection laws.

167.    Plaintiffs and the Classes do not anticipate any difficulty in the management of this litigation.

## VIII.    <u>CAUSES OF ACTION</u>

### COUNT I
### NEGLIGENCE
### (on behalf of the Nationwide Class or, alternatively, the Classes)

168.    Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

169.    Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in the sale, quality control and marketing of the Contaminated Products.

170.    Defendants breached their duty to Plaintiffs and Class Members by marketing, selling, advertising and warranting defective Products (which contain or have a risk of containing Salmonella or other infectious diseases) to Plaintiffs and Class Members, and by failing to take those steps necessary to discontinue selling the Contaminated Products to consumers.

171.    Defendants were aware, or reasonably should have been aware, that the Contaminated Products were harmful and did not perform their intended use.

172.    When they purchased the Contaminated Products, Plaintiffs and Class Members were unaware of their unsafe and dangerous nature.

173.    As a direct and proximate cause of the foregoing, Plaintiffs and Class Members have suffered and will continue to suffer damages as described fully above.

174.    Plaintiffs and the Class Members are entitled to damages in an amount to be determined at trial.

### COUNT II
### NEGLIGENCE *PER SE*
### (on behalf of the Nationwide Class or, alternatively, the Classes)

175.    Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

176.    Defendants owed a duty to Plaintiffs and Class Members to abide by all applicable state and federal statutes, laws, and regulations regarding food safety.

177.    Defendants had a duty to comply with 21 U.S.C. § 331, et seq., which prohibits the introduction of adulterated products into interstate commerce. 21 U.S.C. § 331.

178.    In particular, the FDA-regulated Contaminated Products held by Defendants at their Distribution Center were adulterated through contamination by the Rodent Infestation, and distributed and sold into interstate commerce in violation of 21 U.S.C. § 331, et seq. *See* 21 U.S.C. §§ 342, 351, 361.

179.    Additionally, Defendants violated the Affected States' respective consumer protection statutes by, among other things: 1) willfully concealing the risks and harms associated with the use and handling of the Contaminated Products; 2) failing to disclose and actively concealing the defects in the Contaminated Products; 3) representing that the Contaminated

Products have characteristics, uses, benefits, and qualities which they do not have; 4) representing that the Contaminated Products are of a particular standard, quality and grade when they are not; and 5) intentionally and knowingly misrepresenting material facts regarding the Contaminated Products. *See* ALA. CODE § 8-19-1, et seq.; ARK. CODE ANN. § 4-88-101, et seq.; LA. REV. STAT. § 51:1401, et seq.; MISS. CODE. ANN. § 75-24-1, et seq.; MO. REV. STAT. § 407.010, et seq.; TENN. CODE ANN. § 47-18-101, et seq.

180.     The fact that Defendants failed to comply with these statutes regarding product safety is evidence that Defendants breached their duty of reasonable care and is negligence *per se*.

181.     Plaintiffs and Class Members were in the class of people intended to be protected by these statutes regarding product safety. Defendants' failure to comply with these statutes was a direct and proximate cause of Plaintiffs' and Class Members' injuries.

182.     Plaintiffs and Class Members suffered injury and damages as a direct and proximate result of Defendants' acts and omissions constituting negligence *per se*.

**COUNT III**
**NEGLIGENT FAILURE TO WARN**
**(on behalf of the Nationwide Class and the Alabama, Arkansas and Missouri Classes)**

183.     Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

184.     Defendants, as the seller of the Contaminated Products, had a duty to Plaintiffs and the Classes to exercise the same degree of care, diligence and skill to adequately warn and/or instruct them about the hazards and dangerous conditions related to the use of the Contaminated Products in their intended manner as other sellers would have exercised. Defendants negligently failed to warn of the dangers associated with the use of the Contaminated Products, specifically the Rodent Infestation and associated diseases, pest control issues, improper storage practices, and

associated risks from Plaintiffs and Class Members, and such negligent conduct was a proximate cause of injuries sustained by Plaintiffs' and the Classes.

185.    Defendants were in a position superior to that of Plaintiffs and the Classes to be aware of the dangerous and defective condition of the Contaminated Products, as set forth herein. Thus, Defendants had an obligation to inform Plaintiffs and the Classes of the Rodent Infestation and associated diseases, pest control issues, and improper storage practices. Further, Defendants had a superior opportunity to inspect the Distribution Center and become aware of the Rodent Infestation and associated diseases, pest control issues, and improper storage practices over and above Plaintiffs and the Classes. The absence of adequate warnings and instructions created an unreasonably dangerous condition and risk to Plaintiffs and the Classes that the Defendant knew or should have known about in the exercise of ordinary care. Defendants breached said duty, and negligently failed to warn Plaintiffs and the Classes of the Rodent Infestation and associated diseases, pest control issues, and improper storage practices.

186.    The risks to which Defendants exposed Plaintiffs and the Classes were neither open nor obvious, and they were not a matter of common knowledge.

187.    Plaintiffs and the Classes would not have purchased the Contaminated Products had Plaintiffs known the truth of the hazards and dangerous condition of the Contaminated Product. At the least, Plaintiffs and the Classes would have paid less for the Contaminated Products had they known of the hazards associated with the Contaminated Products.

188.    As a direct and proximate cause of the foregoing, Plaintiffs and Class Members have suffered and will continue to suffer damages.

## COUNT IV
## NEGLIGENT FAILURE TO WARN
### (on behalf of the Tennessee Class)

189.     Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

190.     Defendants are a "seller" as defined by TENN. CODE ANN. § 29-28-102(7).

191.     Defendants, as the seller of the Contaminated Products, had a duty to Plaintiffs and the Class to exercise the same degree of care, diligence and skill to adequately warn and/or instruct them about the hazards and dangerous conditions related to the use of the Contaminated Products in their intended manner as other sellers would have exercised. Defendants negligently failed to warn of the dangers associated with the use of the Contaminated Products, specifically the Rodent Infestation and associated diseases, pest control issues, improper storage practices, and associated risks from Plaintiffs and Class Members, and such negligent conduct was a proximate cause of injuries sustained by Plaintiffs' and the Class.

192.     Defendants were in a position superior to that of Plaintiffs and the Class to be aware of the dangerous and defective condition of the Contaminated Products, as set forth herein. Thus, Defendants had an obligation to inform Plaintiffs and the Class of the Rodent Infestation and associated diseases, pest control issues, and improper storage practices. Further, Defendants had a superior opportunity to inspect the Distribution Center and become aware of the Rodent Infestation and associated diseases, pest control issues, and improper storage practices over and above Plaintiffs and the Class. The absence of adequate warnings and instructions created an unreasonably dangerous condition and risk to Plaintiffs and the Class that the Defendant knew or should have known about in the exercise of ordinary care. Defendants breached said duty, and negligently failed to warn Plaintiffs and the Class of the Rodent Infestation and associated diseases, pest control issues, and improper storage practices.

193.   The risks to which Defendants exposed Plaintiffs and the Class were neither open nor obvious, and they were not a matter of common knowledge.

194.   Plaintiffs and the Class would not have purchased the Contaminated Products had Plaintiffs known the truth of the hazards and dangerous condition of the Contaminated Products. At the least, Plaintiffs and the Classes would have paid less for the Contaminated Products had they known of the hazards associated with the Contaminated Products.

195.   As a direct and proximate cause of the foregoing, Plaintiffs and Class Members have suffered and will continue to suffer damages.

**COUNT V**
**NEGLIGENT FAILURE TO WARN**
**(on behalf of the Mississippi Class)**

196.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

197.   Plaintiffs bring this claim pursuant to MISS. CODE ANN. § 11-1-63.

198.   Defendants, as the seller of the Contaminated Products, had a duty to Plaintiffs and the Class to exercise the same degree of care, diligence and skill to adequately warn and/or instruct them about the hazards and dangerous conditions related to the use of the Contaminated Products in their intended manner as other sellers would have exercised. Defendants negligently failed to warn of the dangers associated with the use of the Contaminated Products, specifically the Rodent Infestation and associated diseases, pest control issues, improper storage practices, and associated risks from Plaintiffs and Class Members, and such negligent conduct was a proximate cause of injuries sustained by Plaintiffs' and the Class.

199.   Defendants were in a position superior to that of Plaintiffs and the Class to be aware of the dangerous and defective condition of the Contaminated Products, as set forth herein. Thus, Defendants had an obligation to inform Plaintiffs and the Class of the Rodent Infestation and

associated diseases, pest control issues, and improper storage practices. Further, Defendants had a superior opportunity to inspect the Distribution Center and become aware of the Rodent Infestation and associated diseases, pest control issues, and improper storage practices over and above Plaintiffs and the Class. The absence of adequate warnings and instructions created an unreasonably dangerous condition and risk to Plaintiffs and the Class that the Defendant knew or should have known about in the exercise of ordinary care. Defendants breached said duty, and negligently failed to warn Plaintiffs and the Class of the Rodent Infestation and associated diseases, pest control issues, and improper storage practices.

200.    The Contaminated Products were defective because they failed to contain adequate warnings or instructions regarding the Rodent Infestation and associated diseases, pest control issues, improper storage practices, and associated risks.

201.    The Rodent Infestation and risk of associated diseases, pest control issues, improper storage practices, and associated risks caused the Contaminated Products to be defective. This defective condition rendered the product unreasonably dangerous to Plaintiffs and the Class.

202.    Plaintiffs and the Class would not have purchased the Contaminated Products had Plaintiffs known the truth of the hazards and dangerous condition of the Contaminated Products. At the least, Plaintiffs and the Classes would have paid less for the Contaminated Products had they known of the hazards associated with the Contaminated Products.

203.    As a direct and proximate cause of the foregoing, Plaintiffs and Class Members have suffered and will continue to suffer damages.

**COUNT VI**
**NEGLIGENT FAILURE TO WARN**
**(on behalf of the Louisiana Class)**

204.    Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

205.    Defendants are a "manufacturer" pursuant to LA. REV. STAT. ANN. § 9:2800.53(1)(b).

206.    Defendants, as the seller of the Contaminated Products, had a duty to Plaintiffs and the Class to exercise the same degree of care, diligence and skill to adequately warn and/or instruct them about the hazards and dangerous conditions related to the use of the Contaminated Products in their intended manner as other sellers would have exercised. Defendants negligently failed to warn of the dangers associated with the use of the Contaminated Products, specifically the Rodent Infestation and associated diseases, pest control issues, improper storage practices, and associated risks from Plaintiffs and Class Members, and such negligent conduct was a proximate cause of injuries sustained by Plaintiffs' and the Class.

207.    Defendants were in a position superior to that of Plaintiffs and the Class to be aware of the dangerous and defective condition of the Contaminated Products, as set forth herein. Thus, Defendants had an obligation to inform Plaintiffs and the Class of the Rodent Infestation and associated diseases, pest control issues, and improper storage practices. Further, Defendants had a superior opportunity to inspect the Distribution Center and become aware of the Rodent Infestation and associated diseases, pest control issues, and improper storage practices over and above Plaintiffs and the Class. The absence of adequate warnings and instructions created an unreasonably dangerous condition and risk to Plaintiffs and the Class that the Defendant knew or should have known about in the exercise of ordinary care. Defendants breached said duty, and negligently failed to warn Plaintiffs and the Class of the Rodent Infestation and associated diseases, pest control issues, and improper storage practices.

208.    At the time the Contaminated Products left Defendants' control, the Contaminated Products possessed characteristics that would cause damage to Plaintiffs and the Class.

209.     The Contaminated Products contained dangerous characteristics, including the Rodent Infestation and associated diseases, pest control issues, and improper storage practices.

210.     Defendants failed to use reasonable care to provide an adequate warning of the Contaminated Products' dangerous characteristics and failed to warn Plaintiffs and the Class of the dangers of such dangerous characteristics.

211.     The risks to which Defendants exposed Plaintiffs and the Class were neither open nor obvious, and they were not a matter of common knowledge.

212.     Plaintiffs and the Class would not have purchased the Contaminated Products had Plaintiffs known the truth of the hazards and dangerous condition of the Contaminated Products. At the least, Plaintiffs and the Classes would have paid less for the Contaminated Products had they known of the hazards associated with the Contaminated Products.

213.     As a direct and proximate cause of the foregoing, Plaintiffs and Class Members have suffered and will continue to suffer damages.

## COUNT VII
## BREACH OF IMPLIED WARRANTY
### (on behalf of the Nationwide Class or, alternatively, the Classes)

214.     Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

215.     Defendants are merchants engaging in the sale of goods to Plaintiffs and Class Members.

216.     There was a sale of goods from Defendants to Plaintiffs and Class Members.

217.     As set forth herein, Defendants marketed and sold the Contaminated Products, and prior to the time the Contaminated Products were purchased by Plaintiffs and Class Members, Defendants impliedly warranted to them that they were of merchantable quality, fit for their ordinary use, and conformed to the promises and affirmations of fact made on the Contaminated Products' packages and labels that they did not.

218.    Plaintiffs and Class Members relied on Defendants' promises and affirmations of fact.

219.    Contrary to these representations and warranties, the Contaminated Products were not fit for their ordinary use and did not conform to Defendants' representations.

220.    Defendants breached the implied warranties by selling Products that risk serious harm and Defendants were or should have been on notice of this breach.

221.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered actual damages in that they purchased the Contaminated Products that are worth less than the price they paid, they lost the opportunity to use the 30-day return policy, and that they would not have purchased at all had they known the harms and risks that the Contaminated Products contained.

222.    Prior to filing suit, Plaintiffs were not required to provide notice to Defendants because, among other things, the goods sold were for human consumption and pre-suit notice would have been futile since Defendants were already on notice of the Rodent Infestation and did nothing to remedy the issue. However, Plaintiffs Graves and Robertson both submitted pre-suit notice of their breach of warranty claims via email, fax, and online.

### COUNT VIII
### UNJUST ENRICHMENT
**(on behalf of the Nationwide Class or, alternatively, the Classes)**

223.    Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

224.    Substantial benefits have been conferred on Defendants by Plaintiffs and Class Members through the purchase of the Contaminated Products and preventing Plaintiffs and Class Members from timely using the 30-day return policy. Defendants knowingly and willingly accepted and enjoyed these benefits.

225. Defendants either knew or should have known that the payments rendered by Plaintiffs and Class Members were given and received with the expectation that the Contaminated Products would have the qualities, characteristics, ingredients, and suitability for use represented and warranted by Defendants and that ordinarily pass in the trade. As such, it would be inequitable for Defendants to retain the benefit of the payments under these circumstances.

226. Defendants' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Defendants to retain the benefits without payment of the value to Plaintiffs and Class Members.

227. Plaintiffs and Class Members are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

**COUNT IX**
**FRAUDULENT CONCEALMENT AND FAILURE TO DISCLOSE**
**(on behalf of the Nationwide Class or, alternatively, the Classes)**

228. Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

229. During the Class period, Defendants knowingly, fraudulently, and actively misrepresented, omitted and concealed from consumers material facts relating to the quality of their products.

230. Defendants had a duty to disclose to Plaintiffs and Class Members the actual quality of its Products which contain or have a risk of containing Salmonella or other infectious diseases.

231. The misrepresentations and concealments complained of herein were material and were made on a uniform and market-wide basis. As a direct and proximate result of these misrepresentations and concealments, Plaintiffs and Class Members have been damaged, as alleged herein.

232.     Plaintiffs and Class Members reasonably and actually relied upon Defendants' representations and concealments.  Such reliance may also be imputed, based upon the materiality of Defendants' wrongful conduct.

233.     Defendants' omissions complaint of herein were also material and made on a uniform and market-wide basis. As a direct and proximate result of these omissions, Plaintiffs and Class Members have been damaged, as alleged herein.

234.     Plaintiffs and Class Members reasonably and actually relied upon Defendants' omissions.  Such reliance may also be imputed, based upon the materiality of Defendants' wrongful conduct.

235.     Based on such reliance, Plaintiffs and Class Members purchased the Contaminated Products and, as a result, suffered and will continue to suffer damages in an amount to be proven at trial.

236.     Had Plaintiffs and Class Members been aware of the true nature of Defendants' business practices, they would not have purchased the Contaminated Products, would have paid less for the Contaminated Products or would have been able to take advantage of the 30-day return policy.

237.     Defendants' acts and misconduct, as alleged herein, constitute oppression, fraud and/or malice entitling Plaintiffs and Class Members to an award of punitive damages to the extent allowed in an amount appropriate to punish or to set an example of Defendants.

**COUNT X**
**VIOLATION OF ALABAMA DECEPTIVE TRADE PRACTICES ACT**
**(ALA. CODE § 8-19-1, et seq.)**
**(on behalf of the Alabama Class)**

238.     Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

239.     This claim is brought on behalf of Alabama residents.

68

240.    Plaintiffs are "consumer[s]" within the meaning of ALA. CODE § 8-19-3(2).

241.    Plaintiffs are "person[s]" within the meaning of ALA. CODE § 8-19-3(5).

242.    The Contaminated Products are "goods" within the meaning of ALA. CODE § 8-19-3(3).

243.    Defendants engaged in "trade or commerce" within the meaning of ALA. CODE § 8-19-3(8).

244.    The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." ALA. CODE § 8-19-5.

245.    By concealing the risks and harms associated with the use and handling of the Contaminated Products (which due to the Rodent Infestation and other unsanitary conditions contain or have a risk of containing Salmonella or other infectious diseases), Defendants engaged in deceptive business practices prohibited by the Alabama DTPA, including representing that Products have characteristics, uses, benefits, and qualities which they do not have; representing that Products are of a particular standard, quality, and grade when they are not; and engaging in other unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce. All of this deception would be material to a reasonable consumer.

246.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of

any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Contaminated Products.

247.   By failing to disclose and by actively concealing the defects in the Contaminated Products, Defendants engaged in unfair and deceptive business practices in violation of the Alabama DTPA.

248.   In the course of Defendants' business, it willfully failed to disclose and actively concealed the dangerous risks posed by the Contaminated Products.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs.

249.   Defendants intentionally and knowingly misrepresented material facts regarding the Contaminated Products.

250.   Defendants knew or should have known that its conduct violated the Alabama DTPA.

251.   Defendants owed a duty to disclose the true safety and reliability of the Contaminated Products.

252.   Because Defendants fraudulently concealed the harms and risks associated with the Contaminated Products, consumers were deprived of the benefit of their bargain since the Contaminated Products purchased were worth less than they would have been if they were free from such harms and risks.

253.   Plaintiffs suffered ascertainable loss caused by Defendants' misrepresentations.

254.   Plaintiffs have also suffered ascertainable loss caused by Defendants' omissions.

255.     As a direct and proximate result of Defendants' violations of the Alabama DTPA,

Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above. As a direct result of

Defendants' misconduct, Plaintiffs and the Class incurred damages.

256.     Pursuant to ALA. CODE § 8-19-10, Plaintiffs seeks monetary relief against

Defendants.

257.     Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or

deceptive practices, attorneys' fees, and any other just and proper relief available under ALA.

CODE § 8-19-1, et seq.

## COUNT XII
## VIOLATION OF THE DECEPTIVE TRADE PRACTICE ACT
### (ARK. CODE ANN. § 4-88-101, et seq.)
### (on behalf of the Arkansas Class)

258.     Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

259.     This claim is brought on behalf of Arkansas residents.

260.     Defendants and Plaintiffs are "persons" within the meaning of the Arkansas

Deceptive Trade Practices Act ("Arkansas DTPA"), ARK. CODE ANN. § 4-88-102(5).

261.     The Contaminated Products are "goods" within the meaning of ARK. CODE ANN.

§ 4-88-102(4).

262.     The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices,"

which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other

unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" ARK. CODE

ANN. § 4-88-107(a)(10). The Arkansas DTPA also prohibits the following when utilized in

connection with the sale or advertisement of any goods: "(1) The act, use, or employment by any

person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission

of any material fact with intent that others rely upon the concealment, suppression, or omission." ARK. CODE ANN. § 4-88-108.

263.    By concealing the risks and harms associated with the use and handling of the Contaminated Products (which due to the Rodent Infestation and other unsanitary conditions contain or have a risk of containing Salmonella or other infectious diseases), Defendants engaged in deceptive business practices, including representing that Products have characteristics, uses, benefits, and qualities which they do not have; representing that Products are of a particular standard, quality, and grade when they are not; and engaging in other unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce. All of this deception would be material to a reasonable consumer.

264.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Contaminated Products.

265.    By failing to disclose and by actively concealing the defects in the Contaminated Products, Defendants engaged in unfair and deceptive business practices.

266.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risk posed by the Contaminated Products.

267.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs.

268.    Defendants intentionally and knowingly misrepresented material facts regarding the Contaminated Products.

269.    Defendants knew or should have known that their conduct was violative.

270.    Defendants owed a duty to disclose the true safety and reliability of the Contaminated Products.

271.    Because Defendants fraudulently concealed the harms and risks associated with the Contaminated Products, consumers were deprived of the benefit of their bargain since the Contaminated Products purchased were worth less than they would have been if they were free from such harms and risks.

272.    Plaintiffs suffered ascertainable loss caused by Defendants' misrepresentations and its concealment.

273.    Plaintiffs also suffered ascertainable loss caused by Defendants' omissions.

274.    As a direct and proximate result of Defendants' violations, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above. As a direct result of Defendants' misconduct, Plaintiffs and the Class incurred damages.

275.    As a result of Defendants' actions, Plaintiffs seek monetary relief against Defendants.

## COUNT XIII
## CIVIL CLAIM FOR THEFT BY DECEPTION
### (Pursuant To ARK. CODE ANN. § 16-118-107)
### (on behalf of the Arkansas Class)

276.    Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

277.    ARK. CODE ANN. §§ 5-36-102 and 103 provide that it is a crime in the State of Arkansas to obtain the property of another person by deception with the purpose of depriving the owner of the property.

278.    ARK. CODE ANN. § 16–118–107(a)(1) provides that any person injured or damaged by reason of conduct that would constitute a felony under Arkansas law may file a civil action to recover damages based on the conduct.

279.    The scheme and course of conduct of Defendants as set forth herein satisfies the elements of a felony under Arkansas law pursuant to ARK. CODE ANN. §§ 5-36-102 and 103 as the aggregate value of the property deceptively obtained by Defendants from the Plaintiffs Class is in excess of $1,000.00

280.    As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and the Class have suffered actual damages as set forth herein.

281.    Accordingly, Plaintiffs and the Class are entitled to an award of damages in an amount in excess of federal diversity jurisdiction limits to be determined at trial as well as their attorney fees and expenses pursuant to ARK. CODE ANN. 16-18-107(a)(3).

## COUNT XIV
## VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES
## AND CONSUMER PROTECTION LAW
## (LA. REV. STAT. § 51:1401, et seq.)
## (on behalf of the Louisiana Class)

282.    Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

283.    This claim is brought on behalf of Louisiana residents.

284.    Defendants and Plaintiffs are "persons" within the meaning of the LA. REV. STAT. § 51:1402(8).

285.    Plaintiffs are "consumer[s]" within the meaning of LA. REV. STAT. § 51:1402(1).

286.    The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." LA. REV. STAT. § 51:1405(A).

287.    By concealing the risks and harms associated with the use and handling of the Contaminated Products (which due to the Rodent Infestation and other unsanitary conditions contain or have a risk of containing Salmonella or other infectious diseases), Defendants engaged

in deceptive business practices, including representing that Products have characteristics, uses, benefits, and qualities which they do not have; representing that Products are of a particular standard, quality, and grade when they are not; and engaging in other unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce. All of this deception would be material to a reasonable consumer.

288.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Contaminated Products.

289.   By failing to disclose and by actively concealing the defects in the Contaminated Products, Defendants engaged in unfair and deceptive business practices.

290.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risk posed by the Contaminated Products.

291.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs.

292.   Defendants intentionally and knowingly misrepresented material facts regarding the Contaminated Products.

293.   Defendants knew or should have known that their conduct violated the Louisiana CPL.

294.   Defendants owed a duty to disclose the true safety and reliability of the Contaminated Products.

295.   Because Defendants fraudulently concealed the harms and risks associated with the Contaminated Products, consumers were deprived of the benefit of their bargain since the

Contaminated Products purchased were worth less than they would have been if they were free from such harms and risks.

296.  Plaintiffs suffered ascertainable loss caused by Defendants' misrepresentations and its concealment.

297.  Plaintiffs also suffered ascertainable loss caused by Defendants' omissions.

298.  As a direct and proximate result of Defendants' violations, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above. As a direct result of Defendants' misconduct, Plaintiffs and the Class incurred damages.

299.  Pursuant to LA. REV. STAT. § 51:1409, Plaintiffs seek to recover actual damages in an amount to be determined at trial; treble damages for Defendants' knowing violations of the Louisiana CPL; an order enjoining Defendants' unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under LA. REV. STAT. § 51:1409.

## COUNT XV
## CLAIM FOR REDHIBITION
### (La. Civ. Code Ann. Art. 2520)
### (on behalf of the Louisiana Class)

300.  Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

301.  In addition to all of the claims asserted herein, pursuant to La. Civ. Code Ann. Art. 2520, the Louisiana Class specifically alleges that the goods and products that they purchased from Defendants possessed redhibitory defects and vices, such that had Plaintiffs and the Class been aware of these defects and vices, each would not have purchased the goods and products from Defendants.

302.     Further, the goods and products sold by Defendants to Plaintiffs and the Class, because of the defects contained therein, rendered the goods and products totally useless to the Plaintiffs and the Class.

303.     Plaintiffs and the Class did not know of or were not aware of the redhibitory defects at the time that each purchased the goods and products, nor were the defects in the goods and products reasonably discoverable by Plaintiffs and the Class.

304.     Defendants had actual knowledge or should have possessed actual knowledge of the existence of the redhibitory defects in the goods and products offered for sale and in fact sold to Plaintiffs and the Class.

305.     As described in this Complaint the redhibitory defects existed prior to and at the time of delivery of the goods or products to Plaintiffs and the Class.

306.     Plaintiffs and the Class are entitled to recover from Defendants, *inter alia*, damages and reasonable attorney's fees pursuant to La. Civ. Code Ann. Art. 2545.

**COUNT XVI**
**VIOLATION OF MISSISSIPPI CONSUMER PROTECTION ACT**
**(MISS. CODE. ANN. § 75-24-1, et seq.)**
**(on behalf of the Mississippi Class)**

307.     Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

308.     This claim is brought on behalf of Mississippi residents.

309.     The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair or deceptive trade practices in or affecting commerce." MISS. CODE. ANN. § 75-24-5(1). Unfair or deceptive practices include, but are not limited to, "(e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;" "(g) Representing that goods or services are of a particular standard, quality, or grade, or

that goods are of a particular style or model, if they are of another;" and "(i) Advertising goods or services with intent not to sell them as advertised."

310.    By concealing the risks and harms associated with the use and handling of the Contaminated Products (which due to the Rodent Infestation and other unsanitary conditions contain or have a risk of containing Salmonella or other infectious diseases), Defendants engaged in deceptive business practices, including representing that Products have characteristics, uses, benefits, and qualities which they do not have; representing that Products are of a particular standard, quality, and grade when they are not; and engaging in other unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce. All of this deception would be material to a reasonable consumer.

311.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Contaminated Products.

312.    By failing to disclose and by actively concealing the defects in the Contaminated Products, Defendants engaged in unfair and deceptive business practices.

313.    In the course of Defendants' business, it willfully failed to disclose and actively concealed the dangerous risk posed by the Contaminated Products.

314.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs.

315.    Defendants intentionally and knowingly misrepresented material facts regarding the Contaminated Products.

316.    Defendants knew or should have known that its conduct was violative.

317.     Defendants owed a duty to disclose the true safety and reliability of the Contaminated Products.

318.     Because Defendants fraudulently concealed the harms and risks associated with the Contaminated Products, consumers were deprived of the benefit of their bargain since the Contaminated Products purchased were worth less than they would have been if they were free from such harms and risks.

319.     Defendants conduct is ongoing. To date, Defendants have failed to adequately disclose to Plaintiffs and the Class the risks and harms associated with the use and handling of the Contaminated Products. Additionally, Defendants have failed to adequately disclose to Plaintiffs and the Class that non-FDA regulated products were contaminated.

320.     Plaintiffs suffered ascertainable loss caused by Defendants' misrepresentations and its concealment.

321.     Plaintiffs also suffered ascertainable loss caused by Defendants' omissions.

322.     As a direct and proximate result of Defendants' violations, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above. As a direct result of Defendants' misconduct, Plaintiffs and the Class incurred damages.

323.     Plaintiffs seek actual damages in an amount to be determined at trial any other just and proper relief available under the Mississippi CPA.

**COUNT XVII**
**VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT**
**(MO. REV. STAT. § 407.010, et seq.)**
**(brought on behalf of the Missouri Class)**

324.     Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

325.     This claim is brought on behalf of Missouri residents.

326. Defendants and Plaintiffs are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

327. Defendants engaged in "trade" or "commerce" in the State of Missouri within the meaning of MO. REV. STAT. § 407.010(7).

328. The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." MO. REV. STAT. § 407.020.

329. By concealing the risks and harms associated with the use and handling of the Contaminated Products (which due to the Rodent Infestation and other unsanitary conditions contain or have a risk of containing Salmonella or other infectious diseases), Defendants engaged in deceptive business practices, including representing that Products have characteristics, uses, benefits, and qualities which they do not have; representing that Products are of a particular standard, quality, and grade when they are not; and engaging in other unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce. All of this deception would be material to a reasonable consumer.

330. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Contaminated Products.

331. By failing to disclose and by actively concealing the defects in the Contaminated Products, Defendants engaged in unfair and deceptive business practices.

332.    In the course of Defendants' business, it willfully failed to disclose and actively concealed the dangerous risk posed by the Contaminated Products.

333.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs.

334.    Defendants intentionally and knowingly misrepresented material facts regarding the Contaminated Products.

335.    Defendants knew or should have known that its conduct was violative.

336.    Defendants owed a duty to disclose the true safety and reliability of the Contaminated Products.

337.    Because Defendants fraudulently concealed the harms and risks associated with the Contaminated Products, consumers were deprived of the benefit of their bargain since the Contaminated Products purchased were worth less than they would have been if they were free from such harms and risks.

338.    Plaintiffs suffered ascertainable loss caused by Defendants' misrepresentations and its concealment.

339.    Plaintiffs also suffered ascertainable loss caused by Defendants' omissions.

340.    As a direct and proximate result of Defendants' violations, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above. As a direct result of Defendants' misconduct, Plaintiffs and the Class incurred damages.

341.    Defendants are liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Defendants' unfair and deceptive practices, and any other just and proper relief under MO. REV. STAT. § 407.025.

## COUNT XVIII
## VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT
### (TENN. CODE ANN. § 47-18-101, et seq.)
### (brought on behalf of the Tennessee Class)

342.     Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

343.     This claim is brought on behalf of Tennessee residents.

344.     Plaintiffs are "natural persons" and "consumers" within the meaning of TENN.
CODE ANN. § 47-18-103(2).

345.     Defendants are "persons" within the meaning of TENN. CODE ANN. § 47-18-
103(2).

346.     Defendants' conduct complained of herein affected "trade," "commerce" or
"consumer transactions" within the meaning of TENN. CODE ANN. § 47-18-103(19).

347.     The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or
deceptive acts or practices affecting the conduct of any trade or commerce," including but not
limited to: "Representing that goods or services have … characteristics, [or] … benefits … that
they do not have…;" "Representing that goods or services are of a particular standard, quality or
grade… if they are of another;" and "Advertising goods or services with intent not to sell them as
advertised." TENN. CODE ANN. § 47-18-104.

348.     By concealing the risks and harms associated with the use and handling of the
Contaminated Products (which due to the Rodent Infestation and other unsanitary conditions
contain or have a risk of containing Salmonella or other infectious diseases), Defendants engaged
in deceptive business practices, including representing that Products have characteristics, uses,
benefits, and qualities which they do not have; representing that Products are of a particular
standard, quality, and grade when they are not; and engaging in other unconscionable, false,

misleading, or deceptive acts or practices in the conduct of trade or commerce. All of this deception would be material to a reasonable consumer.

349.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Contaminated Products.

350.    By failing to disclose and by actively concealing the defects in the Contaminated Products, Defendants engaged in unfair and deceptive business practices.

351.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risk posed by the Contaminated Products.

352.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs.

353.    Defendants intentionally and knowingly misrepresented material facts regarding the Contaminated Products.

354.    Defendants knew or should have known that their conduct was violative.

355.    Defendants owed a duty to disclose the true safety and reliability of the Contaminated Products.

356.    Because Defendants fraudulently concealed the harms and risks associated with the Contaminated Products, consumers were deprived of the benefit of their bargain since the Contaminated Products purchased were worth less than they would have been if they were free from such harms and risks.

357.    Plaintiffs suffered ascertainable loss caused by Defendants' misrepresentations and its concealment.

358.    Plaintiffs also suffered ascertainable loss caused by Defendants' omissions.

359.    As a direct and proximate result of Defendants' violations, Plaintiffs have suffered injury-in-fact and/or actual damage as alleged above. As a direct result of Defendants' misconduct, Plaintiffs and the Class incurred damages.

360.    Pursuant to TENN. CODE § 47-18-109(a), Plaintiffs seek monetary relief against Defendants measured as actual damages in an amount to be determined at trial, treble damages as a result of Defendants' willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

**COUNT XIX**
**DECLARATORY AND INJUNCTIVE RELIEF**
**(on behalf of all the Nationwide Class or, alternatively, the Classes)**

361.    Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

362.    Plaintiffs and Class Members are entitled to declaratory relief establishing that Defendants engaged in unfair and deceptive practices.

363.    Plaintiffs also seek injunctive relief extending Defendants' recall to Plaintiffs and Class Members who purchased and consumed Contaminated Products before Defendants' voluntary recall was issued.

364.    Plaintiffs also are concerned that the problems are systemic and ongoing and seek a court-supervised audit plan be established overseen by a special master or a committee of the Board of Directors ensuring that the following documents are adhered to for a period of not less than five years: a) quality assurance; b) quality control; c) HACCP; and d) a consultant's or expert's plan comprised of the best practices to meet all governmental standards related to pest and rodent control.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs pray that this case be certified and maintained as a class action and for a judgment to be entered upon Defendants as follows:

A.   Appointing Plaintiffs as representatives of the Classes and the undersigned counsel as Class Counsel;

B.   For economic and compensatory damages on behalf of Plaintiffs and all Class Members;

C.   For actual damages sustained;

D.   For treble damages pursuant to law, and all other actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and Class Members are entitled;

E.   For injunctive relief, compelling Defendants to cease their unlawful actions and to account to Plaintiffs for their unjust enrichment;

F.   For injunctive relief, compelling Defendants to extend the recall to Plaintiffs and Class Members who purchased and consumed Contaminated Products before the recall was issued;

G.   For injunctive relief establishing a court-supervised audit plan overseen by a special master or a committee of the Board of Directors ensuring that the following documents are adhered to for a period of not less than five years: a) quality assurance; b) quality control; c) HACCP; and d) a consultant's or expert's plan comprised of the best practices to meet all governmental standards related to pest and rodent control.

H.   For reasonable attorneys' fees, reimbursement of all costs for the prosecution of this action, and pre-judgment and post-judgment interest; and

I.   For such other and further relief this Court deems just and appropriate.

## IX.   **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all causes of action so triable.

Dated: October 17, 2022                                 Respectfully submitted,

*/s/ J. Gerard Stranch*
J. Gerard Stranch, IV
Branstetter, Stranch & Jennings, PLLC
The Freedom Center
223 Rosa L. Parks Ave., Suite 200
Nashville, TN 27203
Tel: (615) 254-8801

gerards@bsjfirm.com

*/s/ Sterling Aldridge*
Sarah Sterling Aldridge
John W. ("Don") Barrett
Barrett Law Group, P.A.
404 Court Square N
P.O. Box 927
Lexington, MS 39095
Tel: (662) 834-2488
saldridge@barrettlawgroup.com
dbarrett@barrettlawgroup.com

*Co-Lead Counsel for Plaintiffs*

Charles Barrett
Neal & Harwell, PLC
1201 Demonbreun St., Suite 1000
Nashville, TN 37203
Tel: (6150 238-3647
cbarrett@nealharwell.com

*Liaison Counsel for Plaintiffs*

James Streett
Streett Law Firm, P.A.
107 West Main
Russellville, AR 72801
Tel: (479) 968-2030
james@streettlaw.com

*State Court Litigation Liaison Counsel for Plaintiffs*

Charles LaDuca
Cuneo Gilbert & LaDuca, LLP
4725 Wisconsin Ave., NW, Ste. 200
Washington, DC 20016
Tel: (202) 789-3960
charles@cuneolaw.com

Gary Klinger
Milberg Coleman Bryson Phillips
Grossman, PLLC
227 W. Monroe Street, Ste. 2100
Chicago, IL 60606

Tel: 847-208-4585
gklinger@milberg.com

Katrina Carroll
Lynch Carpenter, LLP
111 W. Washington, Ste. 1240
Chicago, IL 60602
Tel: (312) 750-1265
katrina@lcllp.com

*Plaintiffs' Steering Committee*

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2022, I electronically filed the above with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

*/s/ J. Gerard Stranch*
J. Gerard Stranch, IV